UNITED STATES of America,
Plaintiff–Appellant,

v.

Abdorasool JANATI; Forouzandeh
JANATI, Defendants–
Appellees.

No. 04–4081.

United States Court of Appeals,
Fourth Circuit.

Argued: May 7, 2004.

Decided: July 9, 2004.

**ARGUED:** Steve Alan Linick, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellant. Eric Lloyd Yaffe, Schmeltzer, Aptaker & Shepard, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Paul J. McNulty, United States Attorney, Thomas H. McQuillan, Assistant United States Attorney, Alexandria, Virginia, for Appellant. Martin J. Gaynes, Roland B. Ninomiya, Schmeltzer, Aptaker & Shepard, P.C., Washington, D.C., for Appellee Abdorasool Janati; David Schertler, Barry Coburn, Coburn & Schertler, Washington, D.C., for Appellee Forouzandeh Janati.

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL and Judge TRAXLER joined.

## OPINION

NIEMEYER, Circuit Judge:

The government filed this interlocutory appeal during the course of a complex healthcare fraud prosecution, requesting that it be given what it contends is the necessary evidentiary latitude to prove its case.

Dr. Abdorasool Janati and his wife, Forouzandeh ("Suzie") Janati, have been indicted for a conspiracy in Northern Virginia from 1996 to 2003 to defraud the United States and private insurance plans of funds for medical reimbursement by submitting to Medicare and the private plans false claims for services allegedly performed by Dr. Janati and others in his neurology practice. In addition to the conspiracy count, Dr. and Mrs. Janati have been indicted in 61 additional counts alleging overt acts, representing some, but not all, of the criminal conduct allegedly undertaken in furtherance of the conspiracy.

On the district court's insistence that the government present its case in three days, the government noted that it could do so through the introduction of charts prepared under Federal Rule of Evidence 1006 and through "summary witnesses." It explained that the charts and witnesses would condense the evidence necessary to present to the jury approximately 1300 individual reimbursement claims that were made in furtherance of the conspiracy and in support of the specific overt acts alleged in Counts 2–62 of the indictment. Concerned about the length, scope, and complexity of the trial, the district court ruled that the government could use charts in its case-in-chief, but it could not refer in those charts or in testimony to any of the 1300 transactions within the scope of the conspiracy that were not alleged as overt acts:

> [T]he charts in their case in chief could not contain any reference to those addi-tional items that are not permitted in their case in chief [to prove the 61 overt acts], obviously. Neither charts or testi-mony or anything else about those addi-tional [1300] claims.

> Those would only become important, de-pending on what the defendant might testify to, they could be used in rebuttal.

But the court also ruled that co-conspira-tors and others could "testify to the con-spiracy they saw." The court reiterated, however, that the parties would be held to three days each in the presentation of their cases.

The government contends that "the dis-trict court abused its discretion in prevent-ing the government from introducing in its case-in-chief pattern-and-practice evidence showing that the Janatis submitted ap-proximately 1,300 false claims (including the 61 false claims charged in the indict-ment) to Medicare and other insurers dur-ing the alleged conspiracy."

To the extent that the district court limited the government to proof of the conspiracy in its case-in-chief to the overt acts alleged in Counts 2–62 of the indict-ment, we reverse. Otherwise, we do not conclude that the district court abused its broad discretion to manage the scope of this large conspiracy case. We therefore affirm in part, reverse in part, and remand with instructions.

I

Dr. Janati, together with his wife, have for ten years operated a healthcare clinic known as the Neurological Institute of Northern Virginia, P.C., which has been engaged in the business of providing neu-rological testing and evaluations to pa-tients. Over the period from 1996 through 2003, the Neurological Institute typically generated on a given day between 20 and 30 claims for reimbursement from Medi-

care and private insurance plans, involving the submission of thousands of claims and generating as much as $75,000 per month in gross proceeds.

In September 2003, the Janatis were indicted for healthcare fraud. The indictment, containing one count for conspiracy for the period 1996 through 2003 and 61 counts for overt acts in furtherance of the conspiracy during the period 2000 through 2002, alleges that the Janatis submitted false claims by overstating the services provided by Dr. Janati and Dr. Mian Li, a fellow neurologist at the Neurological Institute. Three types of false billing are represented in the indictment: claims that the Janatis (1) inflated the number of nerve conduction tests performed for patients, (2) billed but did not perform certain brain wave studies, and (3) "upcoded" office visits, falsely stating that the visit involved a complex medical diagnosis or procedure unsupported by the medical records.

The government has indicated in pretrial proceedings that, of approximately 1600 patient files that it examined from the Neurological Institute, it found that there was evidence of false billing in 1300, or more than 80% of those reviewed, resulting in losses of hundreds of thousands of dollars to Medicare and the other insured plans. Much of the government's proof will depend on the testimony of experts who have compared the medical records for patients of Dr. Janati and Dr. Li with the patients' billing records and who intend to give their opinions that the billing records overstate the work performed.

The district court has already conducted four pretrial conferences, and during the first conference, on November 21, 2003, the court, obviously concerned about the length and complexity of a trial, told counsel for the parties that "I am certainly not going to sit and listen to a thousand witnesses come through about a thousand case files. And I don't know how you plan to summarize this, but we may have to consider some kind of a severance and get this down to some kind of manageable piece of work to deal with." The government assured the court, "We plan to use summary charts extensively in this case because we recognize the volume of the documents and so forth. So, we are well aware of the constraints on the Court's time and so forth."

A few days later, the government submitted a paper to the court and opposing counsel, giving notice of its intent to offer summaries of voluminous evidence pursuant to Federal Rule of Evidence 1006. In this paper, the government stated that it intended to call no more than 12 patients as witnesses; that it anticipated extensive use of summary charts, which it intended to offer into evidence in its case-in-chief to prove the scope and extent of the conspiracy alleged in Count 1. The government indicated that because the Janatis intended to defend the case by blaming two billing employees who worked for the Neurological Institute between 2000 and 2003, it would have to prove "over 1000 instances" of fraud between 1996 and 2002 to show that the criminal conduct was widespread, intentional, and preceded the time when the two employees worked for the Janatis. Dr. Janati opposed the government's plan, filing a motion to preclude the government from using charts "to introduce expert opinions with respect to the contents of up to one thousand unique patient files."

At the second pretrial hearing, on December 12, 2003, the district court indicated that it was denying Dr. Janati's motion to exclude the government's use of summary charts, but without prejudice to objections that the Janatis might make at trial. The court stated, "I will listen to

what specifics you may have once I see the charts and what they attempt to do with them in light of what evidence we have at the time." The court confirmed this ruling with a written order dated December 15, 2003.

At the third pretrial conference, on January 15, 2004, Dr. Janati expressed concern that the government was intending to prove transactions beyond the 61 overt acts alleged in the indictment, involving more than 1000 files relating to patient visits:

Our concern is not just the length of time it would take—You know, we could be here until Christmas trying to defend this case on each of these other thousand. But it would be extraordinarily prejudicial, I don't know how the Government ultimately would intend to put on these other supposed thousand instances of misconduct. And we don't think it is in any way proper in the case.

In response, the government noted that the conspiracy covered seven years and that the overt acts alleged in Counts 2–62 related only to misconduct occurring during 2000 through 2002. The government's attorney pointed out that if the government were denied the right to prove acts other than the 61 overt acts alleged in the indictment, "then we won't be able to show that there was misconduct occurring between '96 and 2000." The court indicated to the parties that it was not making any ruling about the admissibility of the charts at that time. But it expressed concern about the government's proving overt acts other than those alleged in the indictment: "It seems to me if you have got an indictment, the evidence ought to conform to the indictment you have got here. And you just don't simply find whatever evidence you have got out there and—I mean, people can't be on notice of what they are charged with and what they have to defend

that way." After thinking out loud with the attorneys, the court observed, "I don't understand why you didn't go back and pick up some of these counts that you wanted to go forward with and overt acts that you wanted to go forward with and bring them all through the conspiracy and have them charged out." When the government pointed out that it was not required to allege all the overt acts but was permitted to prove as part of the conspiracy count the transactions within the scope of the conspiracy, the court observed, "This case is almost out of hand and out of control. There is an increasing temptation in both civil and criminal cases to blow these cases up to where they get unmanageable and almost untriable." The court then suggested paring the case down by severing five counts from the case and trying them first, giving the government two days to put on its case.

Following the conference, the government filed an opposition to the court's proposed severance, arguing that "[t]o meet its burden of proof, the government intends to introduce evidence through ... summary witnesses showing that the Janatis submitted over a thousand other false claims between 1996 and 2003 which repeated the same fraudulent billing practices." It argued that by using summary charts, it could present evidence relating to the other transactions quickly and without much explanation. In response, Dr. Janati pointed out that each patient file "concerns a different visit(s) by a different patient suffering from a different medical condition," and that he would have to present. a defense with respect to each file. Dr. Janati concluded that

the Government should not be allowed to present summary charts of 1000 patient visits not even listed in the Indictment. Defendants should not be forced to conduct—and the jury and this Court

should not be required to endure— the case-by-case examination of those visits that will be required if the charts are admitted.

The district court conducted the final pretrial conference on January 20, 2004, during which the court indicated that it would permit the government to prove in its case-in-chief only the 61 overt acts as part of the conspiracy and that it would relegate the government's charts and testimony with respect to the thousand other transactions to rebuttal, depending on what the Janatis presented. The court indicated that it would allow such charts and testimony to be used only "in the event they became material in rebuttal." The court did say, however, that it would permit co-conspirators and others to testify "to the conspiracy they saw." The court also returned to its time concern, stating, "You-all are going to be held to three days now. Keep your case down to the three days."

From the district court's oral ruling at this fourth conference, the government filed a notice of appeal pursuant to 18 U.S.C. § 3731 (authorizing a pretrial appeal "from a decision or order of a district court suppressing or excluding evidence").

II

In the context of pretrial conferences in which the district court outlined how it intended to conduct a complex, multi-transactional trial, the district court's rulings were hardly definitive. Nonetheless, we agree that as matters were left in the fourth pretrial conference, the court expressed its intent to proceed at trial by permitting the government to use summary charts to prove the 61 overt acts alleged in Counts 2–62 and then permitting the government to use charts and testimony relating to the other 1300 transactions only in rebuttal to Dr. Janati's

case. The court's ruling in the fourth conference was one of several efforts made by the district court to find a satisfactory method to manage this complex case involving an alleged seven-year conspiracy, thousands of transactions, 61 separate counts of healthcare fraud, and 14 private insurance company victims. The district court was clearly concerned about losing control of the case. From the court's point of view, therefore, it wanted to try the case efficiently—indeed, quickly—by streamlining the evidence and allowing each party three days before the jury.

The government, on the other hand, became deeply concerned that it could not prove the full breadth of the conspiracy if limited to the 61 counts, which relate to only three years of the conspiracy, and that it would fail to prove intent because the 61 counts were only examples of the three types of fraud that the Janatis would try to explain as aberrational mistakes by employees. To prove the full seven-year conspiracy, the government wants to show that there was a pattern and practice of conduct that revealed the requisite fraudulent intent. The government also explained its dilemma of having to choose between charging too many counts, which could be considered "overkill," and too few, which would fail to establish its difficult burden of proof. *See United States v. Tran Trong Cuong*, 18 F.3d 1132, 1142 (4th Cir.1994) (stating that the government engaged in a "classic example of 'overkill' " in bringing a 136–count indictment for violation of the Controlled Substances Act by a physician when "56 counts [would have been] enough to satisfy the prosecutor and to provide proper punishment of a defendant if convicted" and the remaining 80 counts had less evidentiary support).

The Janatis became concerned with the proposal to present large quantities of allegedly repetitious evidence that they

claimed would be "prejudicial." They envisioned the necessity of mounting a defense with respect to every case-file presented by the government to explain how any alleged overbilling occurred. In support of their position, the Janatis contended that the government was not entitled to prove any overt acts other than those alleged in Counts 2–62, a position with which the district court agreed by the time of the fourth pretrial conference.

Thus, we are faced with the amorphous question of whether the district court has abused its discretion with its preliminary, but not necessarily final, ruling made during a pretrial conference to manage this complex case. It is obvious that since the trial has not commenced and no evidence has *actually* yet been denied, the district court remains free to continue its efforts to manage this case to make it triable and understandable to the jury, while still providing fairness to the parties. But because the government may not appeal after jeopardy has attached, it is necessary to resolve in this appeal any limitations placed on the government's case-in-chief. *See* 18 U.S.C. § 3731.

In this context, there are multiple issues presented by the district court's pretrial rulings which both the district court and the parties to this case have tended to blur. Accordingly, we will review the component issues as follows: (1) whether the government may prove in its case-in-chief acts in furtherance of the conspiracy alleged in Count 1 even if those acts are not alleged as overt acts in Counts 2–62; (2) whether the government can use Rule 1006 charts in its case-in-chief to present its experts' conclusions about fraud with respect to some 1300 transactions alleged in furtherance of the conspiracy; and (3) the appropriate balance that must be achieved between the district court's discretionary right to limit the government's

case and the government's right to prove its case. We will address these issues *seriatim.*

## A

■■ First, we reject the Janatis' contention and reverse the district court's ruling that the government is limited during its case-in-chief on the conspiracy count to proving the overt acts alleged in Counts 2–62. It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment. *See United States v. Powers*, 168 F.3d 741, 749 (5th Cir.1999) ("[W]here a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof") (citing *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir.1996); *United States v. Quesada*, 512 F.2d 1043, 1046 (5th Cir.1975); and *United States v. Bullock*, 451 F.2d 884, 889 (5th Cir.1971)); *United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir.1985) ("This Court has previously held that in conspiracy cases, the government is not limited in its proof to establishing the overt acts specified in the indictment") (citing *United States v. Ruiz–Altschiller*, 694 F.2d 1104, 1109 (8th Cir.1982); and *United States v. Sellers*, 603 F.2d 53, 56 (8th Cir.1979)); *United States v. Gold*, 743 F.2d 800, 813 (11th Cir.1984) ("Properly understood ... a [fatal] variance exists where the evidence at trial proves facts *different* from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations").

The Janatis argued to the district court that "these 1000 instances [are] well beyond the counts of the indictment" and will be prejudicial under Federal Rule of Evi-

dence 403. But the indictment in this case charges a conspiracy over a period "[b]eginning in or about 1996 and continuing through in or about 2003" to defraud the United States and healthcare benefit programs by falsifying HCFA–1500 claim forms. While the indictment specifically alleges 61 overt acts, they are alleged "among others." It is these *other* overt acts not alleged in Counts 2–62 that the government proposes to prove through charts and summary witnesses at trial. Assuming that the indictment is a proper indictment, we believe that its allegations are sufficiently broad to cover transactions other than the 61 specifically alleged as overt acts, so long as they are in furtherance of the conspiracy.

 Although the Janatis have not challenged the indictment itself, the Fifth and Sixth Amendments require that a criminal defendant be charged with an indictment and that he "be informed of the nature and cause of the accusation" leveled against him. U.S. Const. amend. V & VI. This requirement is satisfied so long as the indictment provides a defendant with "fair notice of the elements of the offense with which he is charged and sufficient detail so that he can plead an acquittal or a guilty verdict as a bar to a subsequent prosecution for the same offense." *United States v. Jackson,* 327 F.3d 273, 290 (4th Cir. 2003) (citing *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Carrington,* 301 F.3d 204, 209–10 (4th Cir.2002)). As long as the indictment provides this notice and detail, evidence necessary to prove its allegations is relevant in the criminal trial on the indictment.

In the present case, the indictment brought by the government readily meets these requirements. The indictment placed the Janatis on notice that they were being charged with conspiracy to commit healthcare fraud over a specified period involving specified types of false claims against the United States and private plans. And the government identified in the indictment 61 representative overt acts in furtherance of this alleged conspiracy, alleging that they were "among others." The government has also, as part of the pretrial proceedings, proffered evidence of the specific transactions on which it intends to rely in proving the conspiracy count. In these circumstances, we reject the argument that, in proving Count 1 of the indictment, the government can be limited to proving the overt acts alleged in Counts 2–62, and we reverse the district court's ruling to that effect.

B

The government contends also that it should be permitted to use evidence summarized in charts pursuant to Federal Rule of Evidence 1006 to prove the 1300 transactions. The government proposes to list in these charts transactions contained in the Janatis' billing and medical records and to present in them expert opinion testimony as to why each listed transaction represents a fraudulent healthcare claim. Specifically, the government intends to incorporate the testimony of experts as follows:

> Based on a comparison of the number of nerve tests documented in the patients' medical files with the number of nerve tests that appeared on the Janatis' bills, Dr. [David] Preston will testify that the bills reflected more nerve tests than were reflected in the patients' files.... Similarly, to prove that the Janatis upcoded office visit claims, a medical coding expert, Debra Pacha, has reviewed the documentation contained in hundreds of patient medical files to determine whether such documentation supports the Janatis' billings under CPT

code 99215, the most expensive office visit code. Based on this review, Ms. Pacha will testify that the medical documentation does not support the Janatis' bills.

The Janatis respond that the district court properly limited the charts to rebuttal, particularly since the government, though alleging a conspiracy from 1996–2003, charges no pre–2000 conduct in Counts 2–62:

> Without evidence of such conduct, the Government expresses a concern that the jury will be left with the "misimpression" that the Janatis have been "overcharged," which—according to the Government—may prejudice the prosecution. This statement is both remarkable and implausible. It is remarkable because the Government itself drafted the Indictment and elected to exclude pre–2000 conduct. And it is implausible because the Indictment already covers three years and sixty-one counts.

The Janatis also argue that the summary charts would provide *independent* evidence and not a *summary* of the evidence, and therefore would be both inappropriate under Rule 1006 and prejudicial. They argue, "Even if the Government could show some small amount of legitimate prejudice [for being denied the use of these charts], that prejudice is dwarfed by what the Janatis would suffer if forced to defend against one thousand allegedly false claims above and beyond the sixty-one already charged in the Indictment." The Janatis contend that the government already would have sufficient evidence of intent without having to use the charts. Finally, the Janatis complain that the charts would contain opinion evidence and therefore would fall outside the scope of Federal Rule of Evidence 1006, which is designed to summarize voluminous evidentiary writings, not opinions.

■ The district court has not yet ruled on any specific summary chart that has been proposed, but has indicated that any charts referring to acts beyond those charged in Counts 2–62 should be presented on rebuttal, responding apparently to several of the Janatis' fears. The court's ruling limiting the charts' use to rebuttal might only be tentative, but if not, it is too restrictive. The district court's concern grew out of the parties' conceptual confusion about how charts may be used at trial, which may have blurred an understanding by the court of their proper use.

■ First, Rule 1006 is a rule to admit charts into evidence as a surrogate for underlying voluminous records that would otherwise be admissible into evidence. The Rule reads:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The purpose of this Rule is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents. *See United States v. Bakker*, 925 F.2d 728, 736 (4th Cir.1991).

■ To comply with this Rule, therefore, a chart summarizing evidence must be an *accurate* compilation of the voluminous records sought to be summarized. 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 8043, at 525 (1st ed.2000). Moreover, the records summarized must otherwise be admissible in evidence. 31 *id.* § 8043, at 521–22. While the Rule does not require that the

underlying documentation actually be introduced into evidence, it does require that the documents be made available to the opposing party for examination and copying at a reasonable time and place. Fed. R.Evid. 1006. Finally, under the rule, the trial court can require that the underlying documents actually be brought to court. *Id.*; 31 Wright & Gold, *supra,* § 8042, at 519–20. The obvious import of these provisions is to afford a process to test the accuracy of the chart's summarization.

■■■■ Because the underlying documents need not be introduced into evidence, the chart itself is admitted as evidence in order to give the jury evidence of the underlying documents. *See Bristol Steel & Iron Works v. Bethlehem Steel Corp.,* 41 F.3d 182, 190 (4th Cir.1994). In this respect, Rule 1006 summary charts are distinguishable from other charts and summaries that may be presented under Federal Rule of Evidence 611(a) to facilitate the presentation and comprehension of evidence already in the record. *See* Fed.R.Evid. 611(a); *see also* 4 *Weinstein's Federal Evidence* § 611.02[2][a][vii] (Joseph M. McLaughlin ed., 2d ed.2003). These "pedagogical" devices are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been admitted. *See* 6 *Weinstein's Federal Evidence, supra,* § 1006.04[2]. Thus, pedagogical charts or summaries may include witnesses' conclusions or opinions, or they may reveal inferences drawn in a way that would assist the jury. 6 *id.* § 1006.04[2], at 1006–10 to 1006–11. But displaying such charts is always under the supervision of the district court under Rule 611(a), and in the end they are not admitted as evidence.

■■■■ Thus, the opinion of expert witnesses can be summarized on pedagogical charts, subject to regulation under Rule 611(a). And these charts may draw on authority granted under Federal Rules of Evidence 703 and 705, summarizing data on which experts in the case have relied or summarizing the expert's opinions. *See* Fed.R.Evid. 703; Fed.R.Evid. 705. Whenever pedagogical charts are employed, however, the court should make clear to the jury that the charts are not evidence themselves, but are displayed to assist the jury's understanding of the evidence. Rule 1006 charts, by contrast, are admitted into evidence as a surrogate for voluminous writings that are otherwise admissible.

The district court has not definitively ruled on any charts, expressing at the fourth pretrial conference:

> I have told the Government that in principle they may use summary charts. I don't know whether they are admissible or they are not admissible. We will have to look at the charts when they come.

The court's general ruling that charts may be used, leaving specified rulings on them until later, does not constitute an abuse of discretion, and on this we affirm.

### C

Finally, we address the appropriate balance between the district court's right to manage trials and the government's right to prove its case.

■■■■ The scope of the district court's discretion to manage trials before it is and must be particularly broad. Accordingly, we have held, among other things, that district courts have wide-ranging control over management of their dockets, the courtroom procedures, and the admission of evidence. For instance, district courts have discretion to require separate trials for criminal defendants charged in a single indictment, *see United States v. Riley,* 991 F.2d 120, 125 (4th

Cir.1993); *United States v. Schell,* 775 F.2d 559, 569 (4th Cir.1985), to manage discovery, *see United States ex rel. Becker v. Westinghouse Savannah River Co.,* 305 F.3d 284, 290 (4th Cir.2002); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 929 (4th Cir.1995), to fix the length of a jury trial, *see Sims v. ANR Freight Sys., Inc.,* 77 F.3d 846, 849 (5th Cir.1996); *Borges v. Our Lady of the Sea Corp.,* 935 F.2d 436, 442–43 (1st Cir.1991); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 473 (7th Cir.1984), to balance the right of public access to trial proceedings against the parties' privacy rights, *see Under Seal v. Under Seal,* 326 F.3d 479, 485–86 (4th Cir.2003), to decide whether granting a recess or continuance is warranted in a given circumstance, *see United States v. Singleton,* 107 F.3d 1091, 1099 (4th Cir. 1997); *United States v. Colon,* 975 F.2d 128, 130 (4th Cir.1992), to regulate the admission of evidence, *see United States v. Reevey,* 364 F.3d 151, 156 (4th Cir.2004); *United States v. Castner,* 50 F.3d 1267, 1272 (4th Cir.1995), to limit the type and number of witnesses brought at trial, *see United States v. Escamilla,* 467 F.2d 341, 348 (4th Cir.1972), and to place limitations upon the cross-examination of such witnesses, *see Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Turner,* 198 F.3d 425, 429 (4th Cir.1999).

 Subject to the district court's reasonable management of cases brought to the court for trial, the government too has broad discretion to prosecute crimes, probably limited otherwise only by an unconstitutional motive. *See Wayte v. United States,* 470 U.S. 598, 607–08, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). Moreover, when the government prosecutes a conspiracy involving a series of crimes—alleged by the government in this case to number more than 1300—the government must be given additional latitude during trial to carry its burden of proof. Similarly, when it is faced with a difficult task of proving implied intent, it must also be given some extra latitude to distinguish purposeful conduct from mistake. But even as these special circumstances suggest a longer and more complex trial, we have recognized that the government's right must still have limits. *See, e.g., United States v. Tran Trong Cuong,* 18 F.3d 1132, 1141–42 (4th Cir.1994) (admonishing the government for bringing a 136–count indictment instead of 56–count indictment).

In this case, the government has recognized the problem created by attempting to prove a seven-year conspiracy involving thousands of transactions and has proposed to employ summaries and charts as authorized by Rules 1006 and 611(a). And, in principle, the district court has agreed with the government's proposal. But to the extent that the district court finds it necessary to deny the government the use of summary evidence during its case-in-chief, it must accord the government the right in some manner and to some reasonable extent to prove its case the long way. Healthcare fraud is difficult to prove, but trials for such fraud, when allegedly committed over a long period of time, are also difficult to manage. They typically involve numerous individual transactions that form part of a larger crime, extending over a period of years. Consequently, these cases often consume more judicial time and resources than typical single-transaction crimes. *See, e.g., United States v. Thurston,* 358 F.3d 51, 60 (1st Cir.2004) (3–week healthcare fraud trial); *United States v. Vest,* 116 F.3d 1179, 1182 (7th Cir.1997) (55–day healthcare fraud trial); *United States v. Rutgard,* 108 F.3d 1041, 1048 (9th Cir.1997) (5–month healthcare fraud trial); *United States v. Daniels,* 188 F.Supp.2d 1309, 1313 (D.Kan.

 

2002) (2–month healthcare fraud trial). At bottom, the district court is charged with the often difficult task of finding a balance between the need to give the government an opportunity to carry its heavy burden and the need to conduct an efficient and accurate trial that is comprehensible by a jury.

During the course of the four pretrial conferences in this case, the court has already recognized and accepted the government's proposed use of summary charts and summary witnesses to make the trial more efficient. While the court did indicate in its last conference that charts referring to acts beyond the 61 charged in the indictment would be limited to rebuttal, a ruling that ultimately would be too restrictive, the court was not presented with any particular chart on which to rule, and it has not yet excluded any chart. While some charts might be useful on rebuttal, we recognize that the government has the right and the burden to prove in its case-in-chief a conspiracy broader than the individual overt acts alleged in Counts 2–62 and that therefore the district court must give the government a reasonable opportunity to carry this burden. Moreover, the district court must recognize that implied intent is a difficult element to prove, particularly when the defense intends to argue that any overbilling resulted from the honest mistakes of a few of the defendants' employees.

At this stage of proceedings, however, we do not find any abuse of discretion and affirm the district court's course of proceeding, subject to our ruling reversing the district court's ruling to the extent that it limits the scope of the government's evidence in proving the conspiracy count. We remand with the guidance included herein.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*