**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 09-4193**

─────────────

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

     v.

TREMAYNE KENDRICK BLACKWELL, a/k/a Little Kenny, a/k/a
Tremayne Oakley Kendrick, a/k/a Kenny, a/k/a Kendrick
Jermaine Oakley, a/k/a Kendrick Tremayne Oakley,

             Defendant – Appellant.

─────────────

**No. 09-4202**

─────────────

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

     v.

DERRICK RAYSHAWN PARKS, a/k/a Bam, a/k/a Bam Parks, a/k/a
Rayshawn Parks,

             Defendant - Appellant.

─────────────

Appeals from the United States District Court for the Western
District of North Carolina, at Statesville.   Richard L.
Voorhees, District Judge.   (5:05-cr-00257-RLV-DCK-1; 5:05-cr-
00257-RLV-DCK-2)

─────────────

Argued: May 13, 2011              Decided: June 29, 2011

─────────────

Before TRAXLER, Chief Judge, and SHEDD and DUNCAN, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Ross Hall Richardson, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina; Scott Hadden Gsell, Charlotte, North Carolina, for Appellants.  Richard Lee Edwards, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Claire J. Rauscher, Executive Director, Kevin A. Tate, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant Derrick Rayshawn Parks.  Edward R. Ryan, United States Attorney, Adam Morris, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Based on evidence showing their involvement in a drug distribution organization operating near Statesville, North Carolina, from 1999 to 2005, Appellants Tremayne Kendrick Blackwell and Derrick Rayshawn Parks were charged in a one-count indictment with conspiring to possess with intent to distribute 50 grams or more of crack cocaine and five kilograms or more of cocaine powder.  See 21 U.S.C. § 841(a)(2), (b)(1)(A)(ii), (iii); 21 U.S.C. § 846.  The government also filed a notice that it intended to seek enhanced penalties under 21 U.S.C. § 851 based on Blackwell's and Parks' prior drug-related convictions. Appellants were convicted after a jury trial.  The district court imposed a life sentence for Blackwell and a 360-month sentence for Parks.  Appellants raise several challenges to their convictions, and Parks challenges his sentence.  We affirm.

I.

Briefly, the evidence at trial showed the following. Beginning in 1998-1999, Richard Eckles oversaw the operation of a cocaine distribution ring near Statesville.  Eckles obtained kilogram-sized quantities of cocaine for distribution by lower-level dealers and stored the drugs in the homes of various relatives, including his sister Marlene and his niece Shonika.

3

Eckles used his sister's home to cook cocaine powder into crack. Milton Gaines, Shonika's boyfriend, helped Eckles prepare crack for distribution.

Eckles used numerous distributors, including Shonika, Gaines, and Appellant Parks, whom Eckles had known since childhood. Parks initially bought drugs from Shonika and Gaines and later made at least four purchases directly from Eckles in quantities of 4.5 ounces for a total of half of a kilogram. Parks also purchased 9- to 18-ounce quantities from Robert Geter, who was also connected to the organization.

Appellant Blackwell was a friend of Parks and spent time with Parks on a regular basis at Vin Booe's house, where Parks and Blackwell sold crack, and at Geter's house. Blackwell was also one of Shonika's customers; he purchased crack from Shonika in 4.5-ounce quantities. Blackwell also purchased crack directly from Gaines.

Blackwell and Parks both purchased drugs from and sold drugs to numerous members of Eckles' organization. Toney Young, for example, was one of Eckles' suppliers. Young also made trips to Greensboro to buy drugs for Eckles in kilogram and half-kilogram quantities from Robert Dean. Before making these trips, Young would pool his money together with Eckles, Parks and others. Blackwell also added money on one occasion. Young also sold crack directly to Parks and Blackwell, and he

4

purchased from them on occasion as well. Likewise, Blackwell and Parks had a similar buyer-seller relationship with various participants in Eckles' operation—Oderia Chipley, Deleon Dalton, Okiera Myers, and Lashon Gaither. Gaither testified that for a period of time in 2000 and 2001, he purchased crack from Blackwell through an intermediary on a weekly basis.

Blackwell was not gainfully employed, but he owned several vehicles equipped with expensive stereo components and other special features. Officers also seized $5,600 from Blackwell's bedroom, as well as $15,000 in cash from Parks' bedroom. Moreover, scales with cocaine residue were also seized from the house where Parks and Blackwell were staying.

At the close of the evidence, the jury found Parks and Blackwell both guilty on the sole count in the indictment. Using a special verdict form, the jury also found beyond a reasonable doubt that 50 grams or more of crack cocaine and 5 kilograms or more of cocaine powder was attributable to Blackwell and Parks.

## II.

Approximately six months after the verdict, Appellants moved under Rule 33 of the Federal Rules of Criminal Procedure for a new trial on three grounds, only two of which they pursue on appeal: (1) that Juror Martin was biased against them and

5

failed to disclose during voir dire that he knew them; and (2) that the jury was tainted by threatening comments from third parties to various individual jurors. After an evidentiary hearing, the district court denied Appellants' motion for a new trial. We review a district court's order granting or denying a motion for new trial under Rule 33 for an abuse of discretion. See United States v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001). Finding no abuse of discretion by the district court, we reject Appellants' claim of entitlement to a new trial on both of these grounds.

Juror Bias. During voir dire, the district court asked the jury panel as a group whether anyone knew the defendants or the lawyers. Juror Martin did not respond, thereby silently indicating that he did not know either Parks or Blackwell. When questioned individually by the attorneys, Martin assured the court that he did not know of any reason he could not be fair and impartial, that he could render a decision based on the evidence and nothing more, and that he could find Appellants not guilty if the evidence dictated such a finding.

In conjunction with their motion for a new trial, Appellants submitted an affidavit from James Allard, an investigator they hired to interview jurors after the trial about the effect of the third-party communications. Based on his investigation, Allard alleged that Juror Martin knew both

6

Parks and Blackwell prior to trial. According to Allard, Martin had seen them "around town" and knew that they had been tried on drug-related charges in a previous case but believed the judge or jury in that trial had "passed it off." J.A. 1220a. Juror Martin also allegedly told Allard that while Appellants were being tried on these prior drug charges, Martin was at the courthouse on an unrelated matter and saw Appellants laughing "just like it was a big joke [as if] they knew they were going to get off." J.A. 1220b.

At the evidentiary hearing, however, Juror Martin, who did not recognize Allard in court or recall having spoken to a defense investigator, contradicted several of the assertions in the Allard affidavit. For example, Juror Martin testified that he did not know Appellants personally but that he had seen them driving on the street before. Juror Martin acknowledged that, before trial, he had heard co-workers discussing Parks' and Blackwell's involvement in drugs when they learned that Martin could potentially serve as a juror. Juror Martin denied that he told Allard that the judge "let off" Appellants in the previous case or that he saw Appellants laughing and approaching their drug charges in a cavalier fashion. Finally, Juror Martin testified that he based his guilty verdict vote only on the evidence presented at trial and not on any previous out-of-court knowledge.

7

To obtain a new trial because of purported juror dishonesty during voir dire, a defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); see Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002). Additionally, "[e]ven where . . . the two parts of the McDonough test have been satisfied, a juror's bias is only established under McDonough if the juror's motives for concealing information or the reasons that affect the juror's impartiality can truly be said to affect the fairness of the trial." Conaway v. Polk, 453 F.3d 567, 588 (4th Cir. 2006) (internal quotation marks and alterations omitted).

The district court assumed for purposes of analysis that the first McDonough prong was satisfied, i.e., that Martin "failed to answer honestly a material question on voir dire." McDonough, 464 U.S. at 556. Nonetheless, the district court concluded that there was no actual or implied bias on the part of Juror Martin such that a "for cause" challenge would have necessarily succeeded:

> At most, Juror Martin knew or had heard something of Defendants' . . . reputations in the community. Martin never had any personal dealings with either of the Defendants, nor did Martin possess any personal knowledge about the charged conduct. Martin was

8

consistent in advising Investigator Allard and the Court that he based his verdict <u>on the evidence presented during trial</u> as opposed to any extraneous discussions [he] overheard . . . . Although this Court likely would have excused Juror Martin for cause in an abundance of caution, [Appellants] fail to establish that an implied bias existed that would have <u>required</u> the Court to excuse Juror Martin for cause. For these reasons, the Court finds that the second prong of <u>McDonough</u> is not met.

J.A. 1413-14.

Appellants contend that the district court misapprehended the <u>McDonough</u> standard because <u>McDonough</u> obligates a defendant to establish only that the trial court had a valid reason to dismiss the dishonest juror, not that the trial court would have been required to dismiss the juror. As this court has observed, however, a "<u>McDonough</u> claim necessarily fails unless the court would have committed reversible error-that is, abused its discretion-in failing to dismiss [a juror] . . . (1) where a per se rule of disqualification applies; [or] (2) where the court demonstrates a clear disregard for the actual bias of the juror." <u>United States v. Fulks</u>, 454 F.3d 410, 432 (4th Cir. 2006) (internal quotation marks omitted). Appellants have identified no per se rule of disqualification applicable in light of Juror Martin's testimony at the hearing. Moreover, we have found nothing in our review of the record to establish that the district court clearly erred in finding no actual bias. Juror Martin denied stating to Allard that he saw Appellants

9

laughing or that Appellants believed they would be acquitted. Rather, Juror Martin made clear that he had no personal knowledge of the Appellants and was only generally aware of them. Martin specifically denied any knowledge that Appellants were involved in drug-related activity. Therefore, Appellants have also failed to establish that the district court clearly disregarded any actual bias harbored by Juror Martin.

We find no error in the district court's conclusion that Appellants were unable to establish the second prong of McDonough. Accordingly, we reject Appellants' juror bias claim.

Third-Party Intimidation of Jurors. During trial, various unknown individuals communicated in a threatening manner to a few of the jurors as they walked from the courthouse to have lunch. With Appellants' consent, the district court questioned each of the jurors individually on the record. Juror Jolly stated that two people who had been observing the trial from the gallery told her that "we, as jurors, if we found a conviction, we better be ready to deal with the consequences . . . [a]nd they know who we are." J.A. 624. Jolly admitted being "very scared." J.A. 626. When Jolly told the other jurors what had happened, she was told not to worry about it.

Juror Stover did not receive any outside communication directly; he indicated that he had heard that one of the other jurors had been told to "let them go easy" and that Jolly had

10

appeared to be very upset. Juror Watts and Juror Cooper subsequently confirmed that while they were eating lunch, some men dining in the restaurant turned around and told the jurors to "go easy" on Blackwell and "leave him alone." The district court asked Stover, Watts and Cooper if they could still be fair, and they all responded affirmatively.

Because the district court did not question Jolly individually regarding whether she could still be fair, Appellants asked the court bring her back and do so. The district court declined, but indicated it would ask the jury as a group, outside the presence of the spectators, "if they are able to sit and hear the evidence and render a verdict based on the evidence and the law that the court gives to them." J.A. 645. Appellants did not object to the court's proposed group voir dire.

The district court then questioned the jury as a whole as follows: "[C]an all the jurors and each of you individually continue to sit and hear the case, hear the evidence, and render your verdict according to what you hear from the witness stand and the exhibits [admitted] into evidence and follow the law that the court gives to you?" J.A. 651. There were affirmative nods from the jurors, and no individual juror gave a contrary indication. Appellants moved for a mistrial, arguing that the jury had been "hopelessly tainted by the unfortunate

11

circumstances." J.A. 653. The district court denied the motion, concluding that the jury "has not been tainted to the necessary extent to grant such a motion in terms of potential prejudice to the defendants." Id.

In their motion for a new trial based on the alleged jury taint, Appellants relied on Allard's affidavit, which indicated that, in post-trial interviews, various jurors stated that Jolly had been "very upset" by the threats, was "afraid for her life and her children," and did not want to be "involved." J.A. 1220b. The district court, however, concluded that the additional evidence submitted in support of Appellants' motion for a new trial was "not significantly different either in kind or in scope than the information of improper juror contact that the Court was presented with during the trial." J.A. 1416. Because the district court concluded that the evidence was not "newly discovered," it denied the motion as untimely and noted that it did not have the discretion to disregard the time limits imposed by Rule 33. See Fed. R. Crim. P. 33(b). On appeal, Appellants contend that their motion for a new trial was timely but that even if it was not, the district court should have exercised its discretion to consider the motion. We disagree.

Under Rule 33(b), "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1).

12

However, "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). Because Appellants did not file the motion for a new trial until several months after their verdicts, they were required to present newly discovered evidence in support of their motion.

"Newly discovered evidence" under Rule 33(b) means evidence that, in fact, was discovered since the conclusion of the trial. See United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989); United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987). Nothing submitted by Appellants in support of the motion for a new trial could be considered "newly discovered." During the court's in-chambers voir dire of Juror Jolly, Jolly admitted that she had been very frightened and intimidated by the comments made to her. Other jurors confirmed then that Juror Jolly was upset and crying. The district court and the parties were aware of this information during trial, and the scant additional details added by Appellants' post-trial evidence did not reveal anything new about the effect of the communications to Jolly.

Furthermore, Appellants' purported newly discovered evidence is not the type of evidence that can support a Rule 33 motion. "[A] Rule 33 motion is designed to rectify factual

13

injustice, not to correct legal error." United States v. Evans, 224 F.3d 670, 674 (7th Cir. 2000). Thus, "a Rule 33 motion based upon 'newly discovered evidence' is limited to where the newly discovered evidence relates to the elements of the crime charged." United States v. Hanoum, 33 F.3d 1128, 1130 (9th Cir. 1994); see United States v. Rollins, 607 F.3d 500, 504 (7th Cir. 2010) (explaining that "Rule 33 deals with contentions that evidence discovered after trial shows that the accused is innocent"). As we have stated, a new trial should be granted under Rule 33 only if "the evidence [would] probably result in acquittal at a new trial." Chavis, 880 F.2d at 793.

Finally, we reject Appellants' argument that the district court committed error by refusing to consider an untimely motion under Rule 33(b)(2). Although the district court mistakenly indicated that an untimely motion under Rule 33 deprived it of jurisdiction, see Rice v. Rivera, 617 F.3d 802, 809 (4th Cir. 2010) (per curiam), Appellants have failed to present any circumstances suggesting that their filing was delayed by "excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). Accordingly, we affirm the district court's denial of Appellants' motion for a new trial as untimely.

14

Appellants raise three other issues. First, Appellants challenge the district court's decision to admit under Federal Rule of Evidence 1006 a chart offered by the government as a summary of telephone record evidence showing that Parks and Blackwell were connected to virtually every participant in Eckles' drug distribution operation. We apply an abuse-of-discretion standard to a district court's decision to admit a summary chart under Rule 1006. See United States v. Foley, 598 F.2d 1323, 1338 (4th Cir. 1979).

The case agent explained that "the phone chart . . . was compiled [using] . . . probably over a hundred thousand telephone calls reviewed in this case" and that use of the chart would assist him in explaining the telephone evidence to the jury. J.A. 1022. Essentially, the chart consisted of a circle of the names and numbers of other participants in the Eckles organization, all connected with arrows pointing to Parks, whose name was at the center of the circle. Blackwell's name appeared at the bottom center of the chart.

During its deliberations, the jury asked to see the chart. Appellants objected, arguing that the chart was inaccurate and that "the evidence is the testimony, not the chart[]," which was "introduced merely as an aid to the jury." J.A. 1186. The

15

district court overruled Appellants' objection and sent the chart to the jury room with a cautionary instruction reminding the jury that "charts and summaries . . . are only as valid as the underlying evidence tending to support them. . . . [I]t is that evidence on which you must rely."  J.A. 1187.

Federal Rule of Evidence 1006 provides as follows:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006.  Rule 1006, therefore, permits the admission of "charts into evidence as a surrogate for underlying voluminous records"; its purpose "is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives from the voluminous documents." United States v. Janati, 374 F.3d 263, 272 (4th Cir. 2004). Thus, under Rule 1006, the summary chart itself may come into evidence provided it is "an accurate compilation of the voluminous records sought to be summarized" and the underlying records are "otherwise . . . admissible in evidence." Id. The underlying documents themselves, however, do not need to be admitted for a Rule 1006 chart to come into evidence. See id. at 272-73.

16

We conclude that the district court acted well within its discretion in admitting the phone records chart. Appellants do not dispute that the underlying telephone records summarized in the chart were too voluminous to be conveniently examined in court, nor do they dispute that the telephone records were admissible. Appellants argue only that the chart summarizing the phone records was not sufficiently accurate as it listed "only a fraction of the 100,000 call records entered into evidence." Brief of Appellants at 29. Similarly, Appellants suggested at trial that the chart was misleading in its central placement of Parks' name. Rule 1006, however, "afford[s] a process to test the accuracy of the chart's summarization." Janati, 374 F.3d at 273. Although the underlying evidence need not be introduced into evidence, Rule 1006 "require[s] that the documents be made available to the opposing party for examination and copying at a reasonable time and place" and permits the district court to order "that the underlying documents actually be brought to court." Id. Appellants do not suggest that they were deprived of the opportunity to examine the underlying records or challenge the accuracy of the summary in court. Accordingly, this argument fails. See United States v. Strissel, 920 F.2d 1162, 1164 (4th Cir. 1990) (per curiam) (rejecting argument that charts were based on inaccurate information and were therefore inadmissible because "the

17

underlying evidence [was] admissible and available to the opponent so that a proper cross-examination [could] be had").

Appellants also challenge the admission of a chart illustrating the organization of Eckles' drug distribution conspiracy. The case agent prepared the chart as an aid to the jury based on trial testimony that had already been presented from various members of the conspiracy and others. Even assuming the district court committed error, and thereby abused its discretion, see United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007) (explaining that a district court abuses its discretion when it "commits an error of law"), by admitting the organizational chart into evidence and sending it back to the jury room, we nevertheless conclude that any such error was harmless. The evidence connecting both Parks and Blackwell to the conspiracy was overwhelming; indeed, Appellants do not challenge the sufficiency of the evidence on appeal. We agree with the government that the prejudicial effect of the organizational chart, if any, would have been minimal in light of the substantial evidence introduced against Appellants. The chart did not assign a role or title within the Eckles organization to either Parks or Blackwell, nor did it purport to summarize alleged drug transactions by Appellants or the alleged amounts involved. Rather, the chart used lines with arrows to

18

show Appellants were acquainted with or were somehow connected to the other conspiracy members.

Additionally, the district court's instructions to the jury further minimized any prejudicial effect, explaining that "[a] chart and summary is not in itself evidence or proof of any fact" and that the chart "created in preparation for this litigation" merely offered "a party's interpretation of the facts in the case." J.A. 1103. The court twice cautioned jurors to "disregard [the] chart entirely" if they found the chart to be inaccurate or untruthful, J.A. 1103, and to base their decision on the underlying evidence. Accordingly, we reject Appellants' argument that the district court committed reversible error in admitting the charts.

## B.

Appellants next raise a Confrontation Clause challenge to the testimony of Clifford Watkins. Watkins testified that he was in the drug business with Leonard Clement and that Watkins met Parks through Clement. Watkins, at the behest of the police, recorded a conversation with Clement in which Clement talked about getting money from "Bam"—who Watkins identified as Parks—to purchase drugs. The district court admitted the audio tape and Watkins' related testimony under Federal Rule of Evidence 801(d)(2)(E). Clement did not testify at trial.

19

The Confrontation Clause of the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53-54 (2004). In order to determine if a statement was "testimonial" and therefore excludable under the Confrontation Clause, we ask "whether a reasonable person in the declarant's position would have expected his statements to be used at trial-that is, whether the declarant would have expected or intended to 'bear witness' against another in a later proceeding." United States v. Udeozor, 515 F.3d 260, 268 (4th Cir. 2008); see United States v. Jordan, 509 F.3d 191, 201 (4th Cir. 2007) ("[T]he critical Crawford issue here is whether [the declarant], at the time she made her statements . . . , reasonably believed these statements would be later used at trial."). We conclude that a reasonable person in Clement's position would not have expected his comments to be used subsequently at trial given that he did not know he was being recorded by his associate Watkins. See United States v. Watson, 525 F.3d 583, 589 (7th Cir. 2008) ("A statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.") Therefore, Clement's

20

statements were not "testimonial" within the meaning of the Confrontation Clause.[*]

## C.

Finally, Appellant Parks argues that the district court committed procedural error in calculating his Guidelines sentencing range by relying on unsupported drug amounts. The district court adopted the recommendation of the presentence report (PSR) that 2.6 kilograms of crack was attributable to Parks for a base offense level of 36.

In reviewing a sentence, we must first ensure that the district court did not commit any "significant procedural error," such as failing to properly calculate the applicable Guidelines range. Gall v. United States, 552 U.S. 38, 51 (2007). Reliance on "clearly erroneous facts" will constitute "significant procedural error." Id. However, procedural errors committed at sentencing are subject to harmlessness review. See United States v. Boulware, 604 F.3d 832, 838 (4th Cir. 2010). Procedural error is harmless if we can say with "fair assurance" that the district court's explicit consideration of the

---

[*] To the extent that Appellants challenge the district court's admission of Watkins' testimony under the co-conspirator exception to the hearsay rule, see Fed. R. Evid. 801(d)(2)(E), we disagree. There was ample evidence tying Clement to Parks, including phone records, and Clement's statements were clearly in furtherance of the conspiracy. See United States v. Neal, 78 F.3d 901, 904-05 (4th Cir. 1996).

appropriate facts would not have affected the sentence imposed. Id. (internal quotation marks omitted).

The record, including trial testimony from government witnesses and the sentencing testimony of Agent Ramsey, provides sufficient support for the court's drug quantity finding. Eckles testified that he supplied Parks with 4.5 ounces of cocaine powder on 4 occasions; the evidence suggested Parks cooked the 18 ounces into cocaine base. William Barber, Eckles nephew, testified that he saw Parks twice receive crack from Eckles -- 9 ounces one time and 18 ounces on the other. Young testified that from 2002-2003, he delivered 18 ounces of crack to Parks. Gaines testified that he gave Parks at least 2.5 ounces of cocaine powder on about 10 occasions, which was cooked into cocaine base. And Randall Stovall, a distributor for Eckles, testified that he gave Parks at least 4.5 to 9 ounces of crack. Based on the testimony of Eckles and Barber attributing 45 ounces or 1275.75 grams of crack to Parks; the testimony of Young attributing 18 ounces or 510.3 grams of crack; the testimony of Gaines attributing 25 ounces or 708.75 grams of crack; and the testimony of Stovall attributing 4 grams of crack, the district court arrived at a total of 2608.2 grams, or 2.6 kilograms, of crack cocaine attributable to Parks. There was additional evidence suggesting that the total amount found by the district court was a conservative figure. Accordingly,

22

we conclude that the district court did not commit clear error in finding the drug quantity attributable to Parks for sentencing purposes.

IV.

For the foregoing reasons, the convictions and sentences of Appellants are hereby

AFFIRMED.