Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL and Judge GOODWIN concurred in part and concurred in the judgment. Judge MICHAEL and Judge GOODWIN each wrote a separate opinion concurring in part and concurring in the judgment.
OPINION
NIEMEYER, Circuit Judge:
James Dana Sweets was convicted for his participation in an extensive drug trafficking conspiracy involving more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846, and for his participation in a conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(n) (currently, 18 U.S.C.A. § 924(o) (West 2006)). The district court sentenced Sweets to 360 months’ imprisonment. On appeal, Sweets contends principally that Baltimore City police and federal agents obtained evidence against him on two different occasions through violations of his Fifth Amendment rights and then used the evidence against him at trial.
First, he alleges that on May 17, 2004, Baltimore City police officers and federal agents coerced him into revealing the whereabouts of John Long, whom police were seeking in connection with a murder investigation. After Long was arrested, he pleaded guilty to drug trafficking charges and thereafter testified against Sweets pursuant to his plea agreement, implicating Sweets in the conspiracy for which he has now been convicted. Sweets contends that by coercing him to disclose Long’s location, the police compelled Sweets to be a witness against himself.
Sweets also alleges that six months later, on November 18-19, 2004, after he had been arrested by Baltimore City police and federal agents on first-degree murder charges, he was questioned by police and gave a statement without having been advised of his Miranda rights; he was then questioned again on the same matters after having been given Miranda warnings. Sweets alleges that this method was an intentional strategy by police to legitimize his earlier unwarned statement.
We conclude that the May 17, 2004 coerced disclosure of Long’s whereabouts did not violate Sweets’ Fifth Amendment rights against self-incrimination because Sweets’ disclosure of Long’s location, even if testimonial in nature, was not incriminating. Moreover, the government did not introduce the fact of Sweets’ production or any fruits of that fact at trial. With respect to the interrogation of Sweets on November 19, 2004, we conclude that the district court did not clearly err in finding as a fact that Sweets waived his Miranda rights.
Also rejecting Sweets’ claim that the government violated its obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we affirm.
I
Sweets participated in a drug trafficking conspiracy with John Long, Charles Garrison, and Maurice Green, which lasted approximately four years and involved the distribution of roughly four to nine ounces of crack cocaine per week. Sweets was a *125 principal in the conspiracy, usually taking 50% of the conspiracy’s profits. As part of the conspiracy, Sweets and Long kept a half-dozen firearms, including several handguns, a rifle, and a shotgun.
A jury convicted Sweets on one count of conspiracy involving at least 50 grams of crack cocaine and one count of conspiracy to possess firearms in furtherance of drug trafficking. The evidence introduced against Sweets included the testimony of Sweets’ co-conspirator, Long, photographs of the drugs and drug paraphernalia found in Long’s hotel room when he was arrested, and Sweets’ incriminating statement given to law enforcement officers on November 19, 2004. Sweets contends that the evidence was introduced against him in violation of his Fifth Amendment rights. The factual circumstances of obtaining the evidence were as follows.
A
As part of an investigation of John Long for first-degree murder, Baltimore City police officers and federal agents visited Sweets at his house in Baltimore City on May 17, 2004. Police officers knew that Sweets knew Long, and they went to Sweets’ residence with the hope of learning where Long, who was in hiding as the result of an earlier police raid, was presently located. Sweets’ girlfriend admitted the police officers into the house, and after Sweets came out of the bathroom, the officers accompanied him to the living room to ask him questions about where Long was located. At first, Sweets denied knowing where Long was. But after the police told Sweets that they were going “to lock everybody [Sweets, Sweets’ girlfriend, and her nephew] up for obstruction of justice if [Sweets] didn’t take them where [Long] was at,” Sweets agreed to take the officers to Long. After Sweets and the police drove to the hotel where Long was located and the officers verified that Long was actually there, they took Sweets back home. While Sweets and the officers were making the trip to the hotel, other officers remained with Sweets’ girlfriend and her nephew, preventing Sweets’ girlfriend from going to work and preventing anyone from making telephone calls.
At the hotel, the police arrested Long pursuant to a warrant and found drugs and drug paraphernalia in his hotel room. Long later pleaded guilty to drug charges and agreed to testify against Sweets about the pair’s drug trafficking activities. The officers used the drugs and drug paraphernalia recovered from Long’s hotel room as part of the evidence against Sweets.
B
Six months after visiting Sweets to discover Long’s whereabouts, police officers again came to Sweets’ house on November 18, 2004, now with a warrant for his arrest for first-degree murder, a charge not before us. Before formally arresting Sweets, the police officers handcuffed Sweets and asked him about the whereabouts of Maurice Green. After some questioning on that subject, Sweets agreed to take the police to Green, resulting in Green’s arrest. Sweets was then taken to the police station where, at a little after 12:20 a.m., Detective Michael Glenn began questioning Sweets. Sweets gave Detective Glenn an incriminating statement, in which he admitted that Long had fronted him crack cocaine. At 1:40 a.m., Sweets agreed to repeat the incriminating statement on tape. The tape contains Sweets’ receiving and acknowledging Miranda warnings.
The parties dispute when, during the course of these events, Sweets was first given Miranda warnings. Detective Glenn testified at the suppression hearing before the district court that as soon as he entered the room, about 12:20 a.m., to *126 question Sweets, he gave Sweets Miranda warnings, and Sweets, at that time, signed a form containing the warnings. The form noted that the time of the warnings was 12:24 a.m. Detective Glenn stated that he thereafter questioned Sweets and, after receiving an inculpating statement, brought in a tape recorder to record the statement. On tape, he again gave Sweets the Miranda warnings. Sweets, on the other hand, testified that Detective Glenn did not give him Miranda warnings when Detective Glenn entered the room at 12:20 a.m. Rather, Sweets stated that he gave an unwarned statement after which, at about 1:40 a.m., he was given the Miranda warnings that were heard on the tape recording. He also said that he signed the waiver form after giving the first statement, not at 12:25 a.m. as noted on the form.
The taped statement was introduced against Sweets at trial as part of the evidence against him.
Sweets filed a motion to suppress the testimony of John Long, the evidence of drugs and drug paraphernalia obtained from Long’s hotel room on May 17, 2004, and Sweets’ recorded statement taken on November 19, 2004. The district court denied the motions. The court concluded that the testimony of Long would not be suppressed, regardless of how his location became known. With respect to the November 19, 2004 incriminating statement, the court concluded that the first interrogation of Sweets at his house about the location of Green did not taint the statements given by Sweets at the police station and that the statements at the police station' — both the untaped and taped versions — were given pursuant to a valid waiver of Miranda rights.
The jury convicted Sweets of both charged counts. Following sentencing by the district court, Sweets filed this appeal.
II
A
Sweets contends first that John Long’s testimony, as well as the drugs and paraphernalia found in Long’s hotel room, should have been suppressed as the fruits of Sweets’ coerced disclosure of Long’s location at the hotel. His argument that he was coerced to give Long’s location rests on (1) statements by police that they were going to lock up everyone in Sweets’ house for obstruction of justice if Sweets did not take the police to Long; (2) the fact that Sweets did not “feel like [he] had a choice at that point” — the point when he was in the squad car on the way to John Long’s location; and (3) the police restrictions on his girlfriend and her nephew, who were required to remain at Sweets’ house and were prevented from making telephone calls. Thus Sweets argues that Long’s testimony and the drugs and drug paraphernalia found in Long’s hotel room were the fruits of his involuntary “statement” and should be suppressed as a violation of his Fifth Amendment rights. See Chavez v. Martinez, 538 U.S. 760, 769, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003).[1]
The district court made no findings with respect to Sweets’ claim that his disclosure of Long’s location was coerced. For purposes of our analysis, therefore, we assume that Sweets was coerced into showing po *127 lice where Long was located- — -leading to Long’s arrest, to the recovery of drugs and drug paraphernalia in Long’s hotel room, and ultimately to Long’s testimony against Sweets. Under this assumption we must still address whether Sweets was “compelled ... to be a witness against himself,” within the meaning of the Fifth Amendment. U.S. Const., amend. V.
The Fifth Amendment right against self-incrimination “applies only when the accused is compelled [1] to make a testimonial communication [2] that is incriminating.” Fisher v. United States, 425 U.S. 391, 408, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). A “testimonial communication” is usually a verbal or written statement, but it may also include an act. See Doe v. United States, 487 U.S. 201, 209, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988) (“[T]he Fifth Amendment privilege against self-incrimination applies to acts”). Whether a statement or act, the testimonial communication “must itself, explicitly or implicitly, relate a factual assertion or disclose information” that incriminates. Id. at 210, 108 S.Ct. 2341 (emphasis added). This requirement removes from the Fifth Amendment’s protection a myriad of compelled acts that, while leading to the discovery of incriminating evidence, do not themselves make an incriminating factual assertion. See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (responding to a field sobriety test); South Dakota v. Neville, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (taking a Breathalyzer test); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (providing a voice exemplar); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (providing a handwriting exemplar); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (providing a blood sample); Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910) (donning a blouse worn by perpetrator). Thus, “compulsion which makes a suspect or accused the source of real or physical evidence’ [generally] does not violate the Fifth Amendment.” Schmerber, 384 U.S. at 764, 86 S.Ct. 1826.
When a compulsory act does make an incriminating factual assertion, however, the privilege against self-incrimination may be implicated. For example, in cases involving the compelled production of documents where the issue “was whether the act of producing subpoenaed documents, not itself the making of a statement, might nonetheless have some protected testimonial aspects,” Doe, 487 U.S. at 209, 108 S.Ct. 2341, the Supreme Court made “clear that the ... ‘act of production’ itself may implicitly communicate ‘statements of fact’ ” that — if incriminating — would be privileged as testimonial acts. United States v. Hubbell, 530 U.S. 27, 36, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000); see also Chavez v. Martinez, 538 U.S. at 769, 123 S.Ct. 1994; United States v. Doe, 465 U.S. 605, 612-14, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (compelled production of business records). The Court reasoned “that the act of production could constitute protected testimonial communication because it might entail implicit statements of fact: by producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession, and were authentic.” Doe, 487 U.S. at 209, 108 S.Ct. 2341 (citations omitted).
B
In the instant case, Sweets was not compelled to make any verbal or written statement on May 17, 2004. But he was compelled (arguendo) to act in “producing” Long. Thus, applying this “act-of-production” doctrine, we recognize the possibility that Sweets’ act of leading the police to *128 Long might have some testimonial content. See Fisher, 425 U.S. at 410, 96 S.Ct. 1569 (“the act of producing evidence in response to a subpoena nonetheless has communicative aspects of its own, wholly aside from the contents of the papers produced”). In this case, however, the testimony latent in the act of production still does not create a Fifth Amendment violation, because this latent testimony does not incriminate Sweets in any real and substantial way. See Doe, 465 U.S. at 614 n. 13, 104 S.Ct. 1237 (“a party who wishes to claim the Fifth Amendment privilege must be confronted by substantial and real, and not merely trifling or imaginary hazards of incrimination”) (citations omitted); Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Heike v. United States, 227 U.S. 131, 144, 33 S.Ct. 226, 57 L.Ed. 450 (1913).
The testimony latent in Sweets’ production of Long could only be that Sweets was admitting (1) that he knew Long or (2) that he knew Long’s location. But neither admission substantially incriminates Sweets. The fact that Sweets knew Long, a drug conspirator and a murder suspect, does not suggest that Sweets himself was a drug conspirator or a murder suspect. While knowing Long’s location when the police were looking for him might theoretically admit to more, in the context of this case, Sweets’ knowledge of Long’s location added nothing to the store of knowledge that the police had as to Sweets’ role in any criminal offense. The police already knew that Sweets knew Long and that he might know of his whereabouts. Because the police already knew that Sweets knew Long and possibly knew his location — indeed that is why they asked Sweets about Long’s location' — the act of production itself “add[ed] little or nothing to the sum total of the government’s information so as to form the basis of a Fifth Amendment claim.” See United States v. Stone, 976 F.2d 909, 911 (4th Cir.1992) (per curiam). It does not help Sweets’ position to argue that the coerced disclosure of Long “incidentally provided information” to the police because Long later agreed to testify against Sweets and implicate Sweets with the drugs and drug paraphernalia discovered in Long’s hotel. See New York v. Quarles, 467 U.S. 649, 666, 670-71, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (O’Connor, J., concurring) (“interrogation which provides leads to other evidence does not offend the values underlying the Fifth Amendment privilege any more than the compulsory taking of blood samples, fingerprints, or voice exemplars, all of which may be compelled in an ‘attempt to discover evidence that might be used to prosecute [a defendant] for a criminal offense’ ”).
Even though we conclude that there was no incriminating quality to knowledge of Long’s location, the government nonetheless did not seek to prosecute Sweets on some basis that he knew of Long’s location. Sweets was not the primary target of the investigation and indeed was not arrested for criminal conduct until some six months later, and then for murder. Thus, any incidentally incriminating character of Sweets’ act neither added to police knowledge nor was an object of police investigation.
C
Any doubt about whether a Fifth Amendment violation occurred was eliminated when the government agreed not to use Sweets’ act of producing Long against him at trial. Indeed, the government agreed not to use any evidence of the May 2004 questioning of Sweets, and it did not introduce either the specific location of the hotel in which Long was arrested or how police came to that location. Because the *129 government readily agreed not to use evidence that was even arguably tainted, any testimonial character to Sweets’ act did not “furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.” Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). It therefore cannot be claimed that the government used at trial any “testimony” of Sweets, whether explicit or latent, that Sweets might have given on May 17, 2004.
Thus, we readily conclude that in coercing Sweets to reveal the location of Long, the government did not compel Sweets to be “a witness against himself,” in violation of the Fifth Amendment.
D
Even were Sweets’ arguments accepted that police conduct on May 17, 2004, somehow violated Sweets’ Fifth Amendment rights, any exclusionary rule that would exist to protect those rights would still have permitted Long to testify and to authenticate the drugs and drug paraphernalia found in his hotel room. Whether the theory for admitting the witness’ testimony would be that the testimony was sufficiently attenuated from the unconstitutional act to dissipate the constitutional taint; that the police would inevitably have discovered the witness whose testimony was offered; or that the evidence was sourced independent of the illegality, the in-court testimony of a live witness should rarely if ever be suppressed. See United States v. Ceccolini, 435 U.S. 268, 280, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (concluding that live witness testimony should be excluded much less often than other unlawfully obtained evidence). Here, the attenuation between Sweets’ coerced revelation of Long’s location and Long’s subsequent in-court testimony strongly supports the admission of the testimony. Long’s independent acts of will to plead guilty and testify against Sweets, as well as the lapse of time between the May 17, 2004 events and Sweets’ trial in September 2005, utterly undermine any connection between the purported constitutional violation and the testimony of the witness Long. Moreover, “we may not ignore the ‘enormous cost’ of [permanently silencing witnesses] in light of the deterrent purpose of the exclusionary rule.” United States v. Gray, 491 F.3d 138, 157 (4th Cir.2007).
Taken as a whole, Sweets’ argument presents a mistaken but common view of the Fifth Amendment’s self-incrimination clause as a “right to be free from coercive custodial interrogation.” The Amendment, however, says no such thing. Rather, the right against self-incrimination is a trial right aimed at protecting the accused from the indignity of being compelled to give testimony against himself. See Withrow v. Williams, 507 U.S. 680, 692, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). At its center is the right of the accused not to have his own statements introduced against him at trial. Patane, 542 U.S. at 637, 124 S.Ct. 2620. Efforts to protect against such a violation, therefore, must not degenerate to a judicially-created code of pretrial police conduct, as Sweets would have it. While certain doctrines have arisen to protect the Fifth Amendment trial right, such as Miranda and the fruit-of-the-poisonous-tree doctrine, the course advocated by Sweets would do far more than protect him from serving as a witness against himself. It would indeed tend to convert the trial right to a general pretrial code of police procedure in conducting investigations.[2]
*130 In rejecting this approach, we adhere to the text of the constitutional protection that no person “shall be compelled in any criminal case to be a witness against himself.” U.S. Const., amend. V (emphasis added). Thus, “if person A takes the stand to testify against defendant B, this is not the same as forcing B to be a witness against himself, even if B’s compelled pretrial statement led the police to learn of A’s existence and information.” Akhil Reed Amar & Renee B. Lettow, Fifth Amendment First Principles: The Self-Incrimination Clause, 93 Mich. L.Rev. 857, 900 (1995).
As the district court concluded, Sweets’ trial right against self-incrimination was never touched by his coerced disclosure. Even though physical evidence and the testimony of a co-conspirator were introduced against him at trial, his own statements never were.
Ill
Sweets also argues that his incriminating tape-recorded statement given on November 19, 2004, should have been suppressed because (1) after he was arrested on that date, he requested an attorney and was denied one; and (2) his taped statement was given to police following his giving a similar untaped statement which, he alleges, was not preceded by a Miranda warning. He argues that this taped statement was obtained pursuant to a police strategy to get an unwarned, unrecorded statement and then get a warned and recorded statement based on the unwarned statement. See Missouri v. Seibert, 542 U.S. 600, 618, 124 S.Ct. 2601, 159 L.Ed.2d 643 (Kennedy, J., concurring) (noting that use of intentional question-then-warn strategy would render subsequent warned confessions inadmissible). The district court, however, rejected Sweets’ claims simply on the basis of factual findings.
The court found that after police arrested Sweets on November 19, 2004, they requested, without giving Sweets a Miranda warning, that Sweets take them to his co-conspirator Maurice Green. Sweets complied, and after he and the police found Green, the police took Sweets to the police station for questioning. The district court found that at no point prior to arriving at the police station (or thereafter) did Sweets ask for an attorney. The court also found that as he led the police to Green, Sweets was not interrogated about his own case — only about the whereabouts of Green. The district court assumed that during this process, Sweets was not given Miranda warnings.
After finding Green, the police took Sweets to the police station, and Detective Glenn, who had not been involved in the earlier process of finding and arresting Green, began to interrogate Sweets shortly after 12:20 a.m. The court found that before beginning, Detective Glenn gave Sweets a Miranda warning and had him sign a form to confirm the warning. The court also noted that the form acknowledging and waiving the Miranda rights was given before Glenn’s questioning actually began. As the court stated:
Miranda rights were fully explained to Mr. Sweets [after the questioning about the whereabouts of Green but] before the later questioning by Detective Glenn took place. As I say, the difference in time, the difference in location, the fact it was a separate officer and the fact that the first questions related to the whereabouts of Mr. Green rather than *131 Mr. Sweets’ personal involvement, I think all bring this case much more under Mashburn and Oregon v. Elstad than the ... unusual circumstance in Seibert where there was a basis to find an intentional first violation of Miranda to get a confession.
And it’s at 12:25 [a.m.] that he’s advised of those rights. They’re explained to him. Each one is initialed. It’s signed and at that point, there is an interview I find by Detective Glenn in the company of Detective Carew.... There’s an interview with Mr. Sweets after, as I say, after full Miranda rights have been provided and Miranda rights have been waived.
The tape recording itself was not made until over an hour later, at 1:40 a.m., and discloses that Sweets was again given his Miranda warnings at the beginning of the taped interview.
Based on the testimony of Detective Glenn, the Miranda waiver forms, and the other matters in the record, we conclude that the district court’s factual findings were not clearly erroneous.
IV
Finally, Sweets requests a new trial because the government did not disclose grand jury testimony that contradicted Long’s trial testimony, in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); see also Brady, 373 U.S. at 83, 83 S.Ct. 1194. Before the grand jury, Long testified that Sweets had shot at a rival drug gang on a particular occasion. At trial, Long testified that Sweets drove the vehicle and was not the shooter.
There are two problems with Sweets’ argument. First, he concedes the fact that he did receive the grand jury transcript in plenty of time prior to trial. Thus, there could be no violation of Giglio — the government met its disclosure obligation. Second, any violation would be harmless because it is inconceivable that Sweets would have impeached Long because he had previously testified that Sweets had shot at somebody, but at trial indicated that Sweets was in fact not the shooter. Sweets would be arguing that Long was untrustworthy, but only by revealing that Sweets might have been the shooter.
The judgment of the district court is

AFFIRMED.

. Sweets also contends that on this occasion, May 17, 2004, he was not given Miranda warnings, but appropriately he does not attempt to rely on the Miranda violation to suppress Long’s testimony as the fruits of the violation. See United States v. Patane, 542 U.S. 630, 634, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004); Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); Michigan v. Tucker, 417 U.S. 433, 450-51, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974).

. While the Due Process Clause of the Fifth Amendment provides protections against *130 some pretrial police conduct insofar as it "shocks the conscience,” Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Due Process Clause is not at issue here.