**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 17-4102**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

VICTOR OYEWUMI OLOYEDE,

Defendant - Appellant.

**No. 17-4186**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BABATUNDE EMMANUEL POPOOLA, a/k/a Emmanuel Popoola, a/k/a Tunde Popoola,

Defendant - Appellant.

**No. 17-4191**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MOJISOLA TINUOLA POPOOLA, a/k/a Mojisola Oluwakemi Tin Popoola, a/k/a
Moji T. Popoola,

Defendant - Appellant.

**No. 17-4207**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GBENGA BENSON OGUNDELE, a/k/a Benson Ogundele,

Defendant - Appellant.

Appeals from the United States District Court for the District of Maryland, at Greenbelt.
Paul W. Grimm, District Judge.  (8:15-cr-00277-PWG-3) (8:15-cr-00277-PWG-5) (8:15-cr-00277-PWG-7) (8:15-cr-00277-PWG-1)

Argued:  December 13, 2018                                    Decided:  July 31, 2019

Before NIEMEYER, KING, and WYNN Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge King and Judge Wynn joined.

**ARGUED:**  Justin Eisele, SEDDIQ LAW FIRM, Upper Marlboro, Maryland; John O. Iweanoge, II, THE IWEANOGES' FIRM, PC, Washington, D.C.; Richard Alan Seligman, LAW OFFICE OF RICHARD SELIGMAN, Washington, D.C.; Gerald Ruter, LAW OFFICES OF GERALD C. RUTER, P.C., Baltimore, Maryland, for Appellants. Thomas Patrick Windom, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF:**  Robert K. Hur, United States Attorney, Baltimore, Maryland, Jennifer R. Sykes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

NIEMEYER, Circuit Judge:

The four defendants in these appeals, who were charged as participants in a conspiracy that involved numerous others, were tried together and convicted of conspiracy to commit wire fraud and related offenses based on an extensive online dating fraud scheme that induced elderly victims to transfer money to the defendants' bank accounts based on postured romantic relationships. The district court found that the defendants obtained over $2 million in this manner and sentenced the four defendants variously from 18 months' to 234 months' imprisonment. From the judgments against them, the defendants filed these appeals raising numerous pretrial, trial, and sentencing issues — most significantly, an issue relating to a pretrial motion to suppress and an issue relating to the government's use at trial of charts offered under Rule of Evidence 1006. After considering all of the issues raised, we affirm.

I

In May 2015, a grand jury indicted 10 individuals, including the four defendants in these appeals — Gbenga Benson Ogundele; his wife, Mojisola Tinuola Popoola; her brother, Babatunde Emmanuel Popoola; and Victor Oyewumi Oloyede — for their participation in a widespread online dating fraud scheme that resulted in numerous elderly victims suffering substantial financial losses. According to the indictment, from 2011 through 2015, coconspirators initiated sham romantic relationships with at least 17 elderly victims throughout the country by searching online dating websites and then used fraudulent representations to convince the victims to transfer money to bank accounts

controlled by the defendants. The defendants were charged with transferring this money through various facilities to promote the conspiracy and to hide the nature and source of the funds. Based on these allegations, the indictment charged all defendants with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). In addition, it charged Ogundele, Babatunde, and Oloyede with aggravated identify theft, in violation of 18 U.S.C. § 1028A. The district court scheduled two separate trials for the 10 indicted defendants, and the government's case against Ogundele, Mojisola, Babatunde, and Oloyede proceeded to trial first, beginning in October 2016.

At trial, the government's evidence included testimony from 11 victims of the fraud scheme, as well as a daughter of a victim who had recently died. The victims testified as to how they had formed what they thought were meaningful long-distance relationships with a person they met online and had eventually transferred significant sums of money for various reasons as requested by the person, only to realize later that they had been defrauded. These victims' testimony showed that, between November 2012 and April 2014, five of them sent a total of approximately $140,000 to two business bank accounts controlled by Ogundele; that, during a six-month period in 2012, five of them sent a total of $138,000 to two bank accounts controlled by Oloyede, with all but $3,000 of that going to a single business account; and that, in July 2014, one victim deposited $5,000 in cash into an account in the name of Mojisola, who then promptly wrote a check for the same amount to a company controlled by her husband, Ogundele. In addition, the government's evidence showed that some of this and other money was

4

transferred to accounts controlled by Babatunde. For instance, on the same day in October 2012 that one victim deposited $20,000 into Oloyede's business account, $10,000 was transferred from that account to an account that Babatunde controlled but was in the name of one of his sisters.

The government also presented testimony from employees of Bank of America, Capital One, and Wells Fargo regarding activity in approximately a dozen of the defendants' bank accounts, almost all of which had been closed by the banks during the course of the conspiracy. Bank records not only showed numerous wire transfers and cash deposits from the victims who testified but also showed other suspicious large cash deposits made from States throughout the country. For example, bank records from Mojisola's Bank of America account, which had been closed in August 2014, showed that it had received significant cash deposits or teller transfers from persons in Florida, North Carolina, Georgia, Michigan, and Tennessee and that the funds were then quickly withdrawn or transferred. The records also showed that Mojisola's account received several large wire transfers in 2011 from her half-brother, Mukhtar Haruna — a Nigerian national and resident who was indicted with the others but never arraigned. These funds were then transferred into an account controlled by Mojisola's husband, Ogundele.

Finally, the government presented testimony from numerous FBI agents about evidence recovered from search warrants of the defendants' homes, phones, and email accounts. FBI agents also testified to post-arrest statements made by Ogundele, Oloyede, and Babatunde. And an FBI forensic accountant created charts detailing certain activity

in the defendants' bank accounts from 2011 through 2014 and presented those charts to the jury at trial.

After the government rested and the district court denied the defendants' motions for judgment of acquittal, the defendants called a number of witnesses, and Oloyede and Babatunde both testified in their own defense. Generally, their theory of the case was that Haruna had made them believe that the money coming into their bank accounts was to purchase cars for export to Nigeria, thus blaming Haruna for the entire scheme. They also placed blame on Ogundele.

The jury convicted all four defendants on all counts, and the district court thereafter sentenced Ogundele and Oloyede each to 234 months' imprisonment, Babatunde to 144 months' imprisonment, and Mojisola to 18 months' imprisonment.

From the judgments entered against them, the defendants filed these appeals, which we then consolidated.

II

During execution of a search warrant and an arrest warrant at Mojisola's house, FBI Special Agent Monique Winkis handed Mojisola a locked cell phone that had been found in her bedroom and asked her, "Could you please unlock your iPhone?" Mojisola took the phone, entered her passcode, and handed the phone back to Agent Winkis, who then gave the unlocked phone to a forensic examiner for it to be searched. Agent Winkis did not ask for the passcode; Mojisola did not reveal the passcode to Agent Winkis; and Agent Winkis did not see Mojisola enter her passcode.

6

Mojisola filed a motion to suppress the contents of her cell phone in the district court, contending that Agent Winkis's request to open her phone and her compliance with that request without having been given *Miranda* warnings violated her Fifth Amendment right against self-incrimination. The district court denied the motion on the ground that Mojisola's entry of a passcode to unlock her phone was not a "communicative response" by her and therefore was not a testimonial statement subject to *Miranda*. It also found that Agent Winkis's request was not "coercive or threatening" and that Mojisola's compliance was "voluntary."

Mojisola now contends on appeal that, because she was in custody and not informed of her *Miranda* rights, she "could not knowingly and voluntarily [have] waive[d] her rights against self-incrimination." Moreover, she argues that entering her passcode was a communicative act that amounted to self-incrimination.

The government contends that Mojisola's physical action of typing her passcode into a phone was not a testimonial statement that was subject to *Miranda* and that, in any event, the evidence obtained from her cell phone was nonetheless admissible under *United States v. Patane*, 542 U.S. 630 (2004) (plurality opinion), because her action was voluntary.

We thus are presented with the question of whether a person in custody, who has not been given *Miranda* warnings, was compelled to incriminate herself in violation of the Fifth Amendment when she voluntarily, pursuant to an officer's request, used her passcode to open her cell phone but did not disclose the passcode.

7

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Therefore, a violation occurs when "the accused is [1] compelled [2] to make a testimonial communication [3] that is incriminating." *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007) (quoting *Fisher v. United States*, 425 U.S. 391, 408 (1976)). While a testimonial communication is most often in verbal or written form, it may also be made by an act. *Id.* But to be a testimonial communication, the act must "relate a factual assertion or disclose information," *Doe v. United States*, 487 U.S. 201, 210 (1988); it must "express the contents of [the person's] mind," *id.* at 210 n.9.

In this case, Mojisola is faced with the task of demonstrating that her simple act of typing in the passcode out of the FBI's agent's view was a testimonial communication to the agent. Certainly, Mojisola has not shown that her act communicated her cell phone's unique passcode. Unlike a circumstance, for example, in which she gave the passcode to the agent for the agent to enter, here she simply used the unexpressed contents of her mind to type in the passcode herself. *See United States v. Hubbell*, 530 U.S. 27, 43 (2000) (distinguishing "surrender[ing] the key to a strongbox," which is not communicative, from "telling an inquisitor the combination to a wall safe," which is communicative).

Mojisola argues nonetheless that "[o]nly through her communicative conduct of unlocking the iPhone was the government able to ascertain that it belonged to her" and that her act was therefore a testimonial communication. Yet, the ownership of the phone

8

was neither an issue before the district court at the suppression hearing nor an issue before the jury.

In any event, even were we to accept Mojisola's argument that she made a testimonial communication when she unlocked her phone, it would provide no meaningful help to her defense because the fruit of that *voluntary* communication, even though made without a *Miranda* warning, would nonetheless be admissible into evidence. In *Patane*, officers failed to provide a *Miranda* warning to a suspect before asking him the location of his firearm, which he then disclosed. 542 U.S. at 635. The plurality opinion in *Patane* deemed the firearm admissible, reasoning that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause" and that the Clause "is not implicated by the admission into evidence of the physical fruit of a *voluntary statement*." *Id.* at 636 (emphasis added). The plurality therefore saw "no justification for extending the *Miranda* rule to this context," explaining that "[t]he Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *Id.* at 636–38; *see also id.* at 644–45 (Kennedy, J., concurring) (agreeing with the plurality that "evidence obtained following an unwarned interrogation" is admissible). Accordingly, the admission into evidence of data from Mojisola's phone — the fruit of her opening it — "present[ed] no risk that . . . *coerced statements* (however defined) [would] be used against [her] at a criminal trial." *Id.* at 643 (emphasis added).

We conclude therefore that the district court did not err in denying Mojisola's motion to suppress.

9

III

Several defendants contend that the district court abused its discretion in admitting into evidence under Federal Rule of Evidence 1006 a series of charts detailing selected deposits made into their bank accounts. Ogundele and Oloyede note that the charts included deposits related to a "subjective list" of suspected victims and represented an "editorialized subsection of transactions." They also maintain that many of the charts' entries, including those reflecting many of the cash deposits, were never proven to be related to fraudulent activity, but that admitting the charts into evidence implied that every entry was fraudulent. Babatunde contends that the chart relating to his bank account was erroneously admitted because there was no direct evidence that the account was connected to fraudulent activity.

In creating the charts introduced against Ogundele and Oloyede, FBI Forensic Accountant David Rutledge included selected deposits that had been made into the bank accounts consistent with the government's theory of which deposits were tied to illegal activity. For example, with respect to Ogundele's accounts, while Rutledge included *all* cash deposits and *all* ATM deposits to the extent that bank records did not identify whether it was a cash or check deposit, he included wire transfers only to the extent that the bank statement identified the name of the sender and that name was on a list provided to him by the case agent. Similarly, he included check deposits only to the extent that the check was written by an individual on the list and out-of-state teller transfers only to the extent that a receipt associated with the transfer was included as an attachment in a batch of emails that Rutledge was provided.

10

We agree with Ogundele and Oloyede that the charts relating to their accounts failed to comport with Rule of Evidence 1006 because of their selectivity. They did not fully represent the accounts that they were purportedly summarizing. Rule 1006 provides:

> The proponent may use a summary, chart, or calculation *to prove the content of voluminous writings*, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006 (emphasis added). This rule authorizes the admission of charts into evidence that serve "*as a surrogate* for underlying voluminous records that would otherwise be admissible into evidence," thereby "reduc[ing] the volume of written documents that are introduced into evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004) (emphasis added). Stated otherwise, "the chart itself is admitted as evidence in order to give the jury evidence of the underlying documents," *id.* at 273, and therefore it must be an objectively accurate summarization of the underlying documents, not a skewed selection of *some* of the documents to further the proponent's theory of the case, *see id.* at 272. "In this respect, Rule 1006 summary charts are distinguishable from other charts and summaries that may be presented under Federal Rule of Evidence 611(a) *to facilitate the presentation and comprehension of evidence already in the record*." *Id.* (emphasis added). Rule 611(a) charts are not evidence themselves; they are used "merely to aid the jury in its understanding of the evidence that has already been admitted," by, for example, "reveal[ing] inferences drawn in a way that would assist the jury." *Id.*

11

It is apparent that the government in this case was not using the charts as surrogate evidence offered in lieu of voluminous underlying bank records, but rather was seeking to help the jury understand how various related records demonstrated a pattern of suspicious activity engaged in by the defendants. Thus, while the charts could have been shown to the jury under Rule 611(a), it was improper to have admitted them into evidence under Rule 1006. Nonetheless, in the circumstances of this case, we are confident that the error did not affect the defendants' substantial rights, particularly as the same information in the same form could have been shown to the jury under Rule 611(a).

But Ogundele and Oloyede argue further that their right to a fair trial was prejudiced because the government cherry-picked individual records, unfairly spinning the facts. This argument, however, ignores the role of a trial, where each side selects the evidence to be presented to the jury. Each side can challenge facts and respond to the other's facts. In this case, in creating the charts, the government applied criteria to help present its theory of the case, and those criteria were clearly detailed to the jury. The defendants were thus free to cross-examine the government's witnesses about the soundness of the selection, just as if the charts had been shown to the jury under Rule 611(a).

Babatunde contends with respect to the chart admitted under Rule 1006 for his bank account that, even though the chart did summarize all non-payroll deposits involving more than $1,000, the admission was erroneous because there was no direct evidence that the particular bank account represented by the chart was connected to fraudulent activity. But that objection goes to the relevance of the underlying bank

records — not to any requirement for admission of a chart under Rule 1006 — and those records were clearly relevant to the alleged money laundering activities and Babatunde's involvement in them.

IV

Next, Mojisola and Babatunde contend that the district court abused its discretion in denying their motions for a severance. They argue that, by being tried together with Ogundele, they were denied the benefit of his testimony because he would not testify at a joint trial but, they believe, would have testified on their behalf had they been tried separately. They also contend that they were prejudiced by a joint trial because of the possibility that the jury found them guilty by association. In denying this motion, the district court concluded that they did not meet their threshold burden of showing that Ogundele would waive his Fifth Amendment privilege and testify if there were a severance. The court also rejected their argument that the disparity in the amount of evidence relating to them as compared to their codefendants warranted a severance.

Federal Rule of Criminal Procedure 8(b) provides that the government may charge defendants together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," while Rule 14 permits the district court to grant a severance if the joinder "appears to prejudice a defendant or the government." In considering these rules, there is "a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Indeed, where, as here,

13

"defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

In the case before us, Mojisola and Babatunde did not make the requisite showing. As to obtaining Ogundele's testimony, they were required to make a threshold showing that it was likely "that [Ogundele] would testify at a second trial and waive his Fifth Amendment privilege." *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983). While they were not required to establish Ogundele's willingness to testify at a severed trial "to an absolute certainty," they were required at least to show "[a] reasonable probability . . . that the proffered testimony would, in fact[,] materialize." *Id.* They did not meet this threshold showing, however, conceding that they had no evidence that Ogundele would waive his Fifth Amendment privilege. The district court accordingly did not abuse its discretion in denying the severance motion on this basis.

These defendants also contended in the district court that they would be prejudiced by the disparity in evidence against them and the other codefendants and by the "unfair spillover effect on [their] right to a fair trial." But it would take an exceptional case to grant a severance on this basis, and they have not made the necessary showing that the court abused its discretion. Indeed, we have previously recognized that "[a] defendant is not entitled to severance merely because . . . the evidence against one defendant is not as strong as that against the other." *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999).

14

At bottom, this is not one of the "rare" cases where a defendant properly joined under Rule 8(b) with others has established that a severance was required to preserve his or her right to a fair trial. *See United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012). Accordingly, we affirm the district court's denial of Mojisola and Babatunde's motions.

V

Each defendant has raised challenges to evidentiary rulings made by the district court during the course of trial. Of course, it is well established that the district court, as a trial court, has broad discretion to admit evidence in the management of a trial, and we will overrule the district court's evidentiary rulings only when the court has abused its broad discretion to the prejudice of a party.

A

First, Mojisola, Babatunde, and Ogundele contend that the district court abused its discretion in admitting inculpatory portions of a post-arrest statement given by Ogundele while excluding, as untrustworthy hearsay, other portions, including statements tending to exculpate Mojisola and Babatunde.

After being arrested and read his *Miranda* rights, Ogundele agreed to be interviewed by Special Agent Custer. In his statement, Ogundele said that he ran a used car business and admitted that he used his business accounts to move money from the United States to Nigeria, working with Haruna, his brother-in-law in Nigeria, to do so. When shown a statement for one of his business bank accounts that reflected wire

15

transfers from various victims, he admitted that he did not always know the people who were putting money into his account but stated that he believed they were exploring business opportunities in Nigeria. After making those statements against his interests, Ogundele also made statements to exculpate Babatunde and Mojisola. He said, "Babatunde Popoola does not help him with the business at all." Similarly, he said that his wife, Mojisola Popoola, was "not involved in the business at all," but acknowledged that after one of his accounts had been closed, she had "accepted deposits into her account at [his] direction." Nonetheless, he reiterated that she "does not know anything about the business and [that] no one calls or contacts [her] to deal with the business."

At trial, the district court, applying Federal Rule of Evidence 801(d)(2)(A), allowed the government to introduce into evidence portions of the statement made by Ogundele but excluded, as untrustworthy hearsay, the portions in which Ogundele exculpated Babatunde and Mojisola. In finding the exculpatory hearsay portions not sufficiently trustworthy to be admitted, the court explained that Ogundele was motivated "to shift blame away from" his wife and her brother "and onto himself." The court also noted "the nature and strength of the government's proffered evidence." The court rejected the defendants' argument that the hearsay portions should be admitted under Rule 106, the "rule of completeness," noting that that rule only applies to written or recorded statements and that, in any event, it could not be used to overrule explicit hearsay rules.

Mojisola now contends that the court abused its discretion, arguing that the portion of the statement made by her husband about her accepting deposits into her account *at his*

16

*direction* rendered the entire exculpatory portion admissible under Rule 804(b)(3) as a statement against Ogundele's interest. Alternatively, she invokes Rule 807's residual exception, which requires "equivalent circumstantial guarantees of trustworthiness." While Rule 804(b)(3) does, as a general matter, provide a hearsay exception for statements made against one's interest, the particular portion of Ogundele's statement that Mojisola seeks to admit barely included any self-inculpatory material and was directed mostly to shifting responsibility away from his wife. Thus, we conclude that the district court did not abuse its discretion in relying on Ogundele's motive for exculpating his wife to find this portion of the statement untrustworthy. *See Williamson v. United States*, 512 U.S. 594, 600–01 (1994) (holding that Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"); *United States v. Dargan*, 738 F.3d 643, 650 (4th Cir. 2013) (identifying factors to assess trustworthiness).

Ogundele and Babatunde also contend that the district court abused its discretion by not applying a common law rule of completeness to admit Ogundele's entire post-arrest statement. While they recognize that Rule 106 applies only to writings and recorded statements, they maintain that there is a "still-viable common law on the rule of completeness" that should have allowed the entire statement to come in. While we doubt that a residual common law rule of completeness survives Rule 106's codification, we hold that any such common law rule cannot be used to justify the admission of inadmissible hearsay. *See* Fed. R. Evid. 802 ("Hearsay is not admissible unless any of

the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court").

Accordingly, we conclude that the district court did not abuse its discretion in allowing the government to introduce only portions of Ogundele's post-arrest statement.

B

In a similar vein, Babatunde contends that the district court abused its discretion in restricting him from cross-examining an FBI agent about whether he had made certain exculpatory statements to that agent during his post-arrest interview. He argues that the statements were not being offered for their truth but for the fact that he made them to the FBI. The district court rejected the argument, noting that if Babatunde wanted to rely on portions of his prior statement, he would have to take the stand and satisfy the requirements of Rule 801(d)(1)(B) (providing that a statement is not hearsay if the declarant testifies and is subject to cross-examination about a prior consistent statement that is offered to rebut a fabrication charge or to rehabilitate the declarant's credibility). We conclude the district court did not abuse its discretion in so ruling.

C

Next, Babatunde contends that the district court abused its discretion in preventing him from cross-examining Agent Custer about Custer's knowledge of a Nigerian named "Marcus" — a man whom Babatunde claims was a car dealer in Nigeria with whom he was doing legitimate business. The issue arose when counsel for Babatunde, cross-examining Agent Custer, asked him if he knew to whom "chairman" referred in a

18

communication in which an indicted coconspirator told Babatunde that the "chairman said [you] should give me $3900." When Custer stated that he could not "answer that question with any specificity as [it] relates to this investigation," Babatunde's counsel sought to refresh his recollection by handing him a copy of a redacted email that Custer had sent to the prosecutors describing information found on the coconspirator's cell phone, including that Marcus's phone number had been saved in the phone's contacts under "chairman." After counsel attempted to describe the contents of the email, the government objected, leading to a bench conference where Babatunde's counsel stated that he was trying to elicit that Agent Custer had "identified who Marcus is." The court first indicated that Babatunde's counsel could ask the agent "if, based on his refreshed recollection, he knows who Marcus is," but then the government indicated that on redirect, it would "ask the agent if he had seen other people in other documents referenced as chairman," which would create a problem because Ogundele is also "referenced as chairman in various other communications." To avoid the confusion, the court then instructed Babatunde's counsel simply not to "refer to the name Marcus."

We conclude that the district court did not abuse its discretion in so ruling and, in any event, any error was certainly not so serious as to warrant vacating Babatunde's convictions. Despite Babatunde's assertions to the contrary, it is far from clear that "Marcus" was not also involved in the scheme, and if Babatunde's counsel had been allowed to establish that the government had learned of Marcus during its investigation, that fact would likely have done little to show that Babatunde's dealings with Marcus were legitimate.

19

D

Babatunde also contends that while the government introduced evidence at trial to show his sophistication in tax and banking matters — including a college transcript reflecting his high grades in accounting courses — the court erroneously prevented his counsel from eliciting from Agent Custer that Custer was aware of other fraud schemes targeting attorneys in an effort to show that even sophisticated individuals could be fraud victims. We conclude that the district court did not abuse its discretion in excluding this evidence as irrelevant. Moreover, even if its exclusion was error, it was clearly harmless.

E

Babatunde contends finally that the district court abused its discretion in admitting his tax returns for 2011 through 2013, arguing that "[t]his was simply done to inflame the jury against [him] by suggesting [he] was not paying taxes on taxable income" and thus "committing a separate crime, tax evasion." Again, we conclude that the court did not abuse its discretion in admitting the tax returns. The fact that Babatunde did not report the substantial sums flowing through his account was relevant to the government's effort to show that the funds were ill-gotten.

F

Mojisola contends that the district court abused its discretion in allowing the government to introduce (1) her 2013 federal bankruptcy filing; (2) her 2013 Maryland welfare and food stamp application; and (3) her application to purchase a timeshare in 2014 — none of which reported the funds that came through her bank account during the

20

relevant time period. She asserts that the "government's theory of admissibility" — that her failure to disclose those funds in those documents tended to show that she knew that the funds coming through her account were illegitimate — "was based on a false premise absent establishing through an expert witness that the money flowing in and out of her account was her income [that] she had a duty to disclose on these various forms." Invoking Federal Rules of Evidence 404(b) and 403, she maintains that the admission of this evidence constituted a "thinly veiled attack on [her] character and any legitimate probative value was outweighed by the serious risk of unfair prejudice."

We conclude, however, that these documents were admissible under Rule 404(b) as both relevant to and probative of her knowledge that the funds coming into her bank account were illegitimate. *See* Fed. R. Evid. 404(b) (providing that evidence of a crime, wrong, or other act, while not admissible to prove a person's character, is admissible for proving knowledge); *see also United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). Mojisola was, of course, free to counter that inference by showing that she had no duty to disclose the funds on the various forms because they only passed through her account.

Moreover, we conclude that the district court did not abuse its discretion in ruling that the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403; *Queen*, 132 F.3d at 997–98.

VI

The defendants next contend that the district court erred in giving three particular instructions to the jury. We address each in turn.

21

## A

First, all defendants contend that the district court erred in giving a willful blindness instruction to the jury, maintaining "that there was not sufficient evidence as a threshold matter to support the assertion that [they] deliberately avoided learning the truth."

The willful blindness doctrine "is premised on the idea that defendants should not be permitted to 'escape the reach' of criminal statutes that require proof that a defendant acted knowingly or willfully 'by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances.'" *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)). "But, to ensure that the willful blindness doctrine retains 'an appropriately limited scope that surpasses recklessness and negligence,' its application has 'two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.'" *Id.* (quoting *Global-Tech Appliances*, 563 U.S. at 769). Thus, we have made clear that while "requests for willful blindness instructions should be handled with caution," it is nonetheless "appropriate to instruct the jury on willful blindness when the defendant claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance." *Id.* (cleaned up).

We conclude that, in this case, the evidence justified the district court's decision to instruct the jury on willful blindness, as it amply allowed the inference that the defendants "subjectively believe[d] that there [was] a high probability" that the funds

22

coming into their bank accounts were illicit. *Global-Tech Appliances*, 563 U.S. at 769. For instance, there was evidence that when banks closed certain defendants' bank accounts, the defendants simply opened new ones and continued the same activity. There was also evidence that many of the defendants' bank statements reflected significant wire transfers from individuals they did not know. And certain defendants took deliberate actions to avoid confirming that the money in fact represented proceeds of fraud. For example, Ogundele indicated to the FBI that he told Haruna that he was uncomfortable seeing those names on his bank statements and that the deposits should be in cash or otherwise structured to avoid that. The deposits into Oloyede's accounts followed a similar pattern. Similarly, the jury could have inferred that Mojisola thought it was highly likely that the funds flowing through her account were illegitimate but was careful never to confirm the details of the operation with her husband. And while Oloyede argues that he gave testimony that he actually took affirmative steps to discover the source of the funds and was reasonably assured by Haruna and Ogundele that the funds were legitimate, the jury was not required to believe his version of events.

In addition, the defendants challenge the form of the willful blindness instruction given by the district court, but, after carefully reviewing the instruction, we find no reversable error.

B

Ogundele contends that the district court erred in instructing the jury on the elements of aggravated identity theft, particularly "the required mental state."

23

Specifically, he appears to contend that the district court did not instruct the jury that the government must show that he *knew* that the means of identification belonged to another person. But the record does not support his argument. The court specifically instructed the jury that "the government must prove that the means of identification was that of an actual person either living or dead, *and that the defendant knew* that the means of identification was that of a natural person." (Emphasis added).

C

Finally, Ogundele and Babatunde (adopting Ogundele's argument) contend that the court erred in giving the form of the aiding-and-abetting instruction that it gave when applied to aggravated identity theft, arguing that the instruction "did not sufficiently inform the jury of the required mental state" and relying on the Supreme Court's decision in *Rosemond v. United States*, 572 U.S. 65 (2014). The *Rosemond* Court held that to prove that a defendant aided and abetted a violation of 18 U.S.C. § 924(c) — which prohibits using or carrying a firearm during and in relation to any crime of violence or drug trafficking crime — the government must show "that the defendant actively participated in the underlying drug trafficking or violent crime with *advance knowledge* that a confederate would use or carry a gun during the crime's commission." *Id.* at 67 (emphasis added). It further concluded that the jury instructions given at Rosemond's trial "were erroneous because they failed to require that the defendant knew in advance that one of his cohorts would be armed." *Id.* Pointing to *Rosemond*, Ogundele argues that the same "advanced knowledge" requirement should apply to the aggravated identity

24

theft statute, 18 U.S.C. § 1028A, and that the jury instructions given in this case were deficient because they "could allow the jury to determine that the defendants were guilty of aiding and abetting the crime without prior knowledge of the aggravated nature of the crime."

We disagree. As the *Rosemond* Court explained, "a person aids and abets a crime when (in addition to taking the requisite act) he intends to facilitate that offense's commission," and "the intent must go to the specific and entire crime charged." 572 U.S. at 76; *see also id.* at 77 ("[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission"). The problem in *Rosemond* was that the challenged instruction allowed the jury to convict if the defendant (1) "knowingly and actively participated in the *drug trafficking crime*" and (2) "*knew his cohort used a firearm* in the drug trafficking crime," *id.* at 82 (emphasis added), thus allowing a conviction even if the defendant had no advance knowledge that one of his confederates would be carrying a gun. Here, by contrast, the district court instructed the jury that "the government must establish the defendant knowingly participated *in the aggravated identity theft charged in Counts Three through Six*." The instruction also required the government to "prove that the defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime." And elsewhere, the instructions made clear that the defendant must have "participate[d] in the crime as something he or she wished to bring about," "knowingly associate[d] him or herself with the criminal venture," and sought "by his or her actions to make the criminal venture succeed." Accordingly, we conclude

25

that there was no *Rosemond* problem with the aiding-and-abetting instruction given by district court.

VII

Babatunde contends that the evidence was insufficient to support each of his convictions — for conspiracy to commit wire fraud, conspiracy to commit money laundering, and aggravated identity theft. Alternatively, he argues that, at the very least, the district court should have granted his motion for a new trial based on the weakness of the government's case against him.

As to his conviction for conspiracy to commit wire fraud, Babatunde argues that "there was absolutely no evidence tying [him] to the scheme to defraud the alleged victims" and that instead the transactions at issue were "related to his automobile business and from legitimate sources." But while, as he notes, he "testified at trial that he was not part of any scheme but was a legitimate businessman that performed a few financial transactions in relation to what he was led to believe was a legitimate business," the jury was not required to accept his account in light of the government's substantial evidence to the contrary. Such evidence included Babatunde's pattern of using other people's bank accounts to accept the fraudulent funds despite having his own bank accounts and his incriminating communications recovered from his cell phone, such as text messages in which he instructed another charged coconspirator to structure transactions to avoid a $10,000 reporting requirement.

Similarly, this and other evidence was sufficient to support Babatunde's conviction for conspiracy to commit money laundering. Babatunde argues that this "conviction cannot be sustained because [he] did not conspire to 'conceal' the funds." But that ignores how, for example, he wrote himself 11 checks totaling $70,000 in 2011 solely to move money from one bank account to another and how he quickly withdrew victims' money from the bank accounts he controlled, engaging a pattern of maxing out ATM withdrawals.

Finally, Babatunde argues that the evidence was insufficient to support his conviction for aggravated identity theft. The aggravated identity theft statute imposes a mandatory consecutive two-year prison sentence against anyone who, "during and in relation to [a qualifying felony], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). Here, both Babatunde and Oloyede were convicted of aggravated identity theft based on their use of the name and bank account number of one of Babatunde's sisters, a woman named Abiola Akinmboni. Babatunde argues, however, that he had Akinmboni's permission to use her account and therefore possessed "lawful authority." But we have previously rejected this precise argument. *See United States v. Otuya*, 720 F.3d 183, 189 (4th Cir. 2013) ("[I]t is obvious that, with or without permission from its rightful owner, a defendant who uses the means of identification of another 'during and in relation to any felony violation enumerated' in the statute necessarily lacks a form of authorization recognized by law"); *see also id.* at 190 ("[T]he plain meaning of § 1028A(a)(1) is

27

unambiguous: one who uses a means of identification to commit an enumerated felony does not act with 'lawful authority'").

Accordingly, we conclude that the evidence was sufficient to support each of Babatunde's convictions and that the district court did not abuse its discretion in denying his motion for a new trial.

VIII

Finally, three of the defendants raise issues pertaining to their sentences.

First, Babatunde challenges the district court's calculation of his advisory sentencing range — particularly, (1) its determination that he was accountable for a loss of more than $250,000 but less than $555,000, triggering a 12-level increase under U.S.S.G. § 2B1.1(b)(1)(G), as compared to the 8-level increase he argued was applicable for a loss of $119,000; (2) its application of a 3-level enhancement under § 3B1.1(b) for his role in the offense; and (3) its application of a 2-level enhancement under § 2S1.1(b)(3) for sophisticated laundering. After carefully reviewing the record, however, we cannot conclude that the district court clearly erred in the factual findings supporting any of these enhancements.

Next, Ogundele challenges his sentence on the ground that the district court erred in its calculation of his advisory sentencing range by applying a 16-level increase to his offense level based on a finding that he was accountable for more than $1.5 million but less than $3.5 million in loss. The record shows, however, that this was a conservative

28

estimate of the loss for which he was accountable based on the activity in his own bank accounts.

Finally, Oloyede challenges the district court's decision to hold him accountable for a loss amount of $1.6 million. But that determination too was based on a reasonable estimate of the fraudulent proceeds that flowed through Oloyede's bank accounts. He also argues more broadly that his sentence was both "procedurally and substantively unreasonable because the court failed to make an individualized assessment of all factors set forth in 18 U.S.C. § 3553(a) and in so doing imposed a sentence greater than necessary to accomplish the goals of sentencing." But the record reflects that the district court thoroughly considered how the § 3553(a) factors applied to Oloyede in imposing a sentence that was at the top of the advisory sentencing range.

\* \* \*

For the foregoing reasons, we affirm the judgments of the district court.

AFFIRMED